**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| REAGAN PEREZ, CAROLYN MELODY, ANASTASIA BYRNE, GEORGIA BROWN, REGAN JACKSON, MACEY DUNN, BROOKE HARNISCH, DELILAH STABERG, MEILIN LEMIS, GRACE HINTON, ALEXA KIRSCHNER, EMMA PEREZ, MORGAN SAYLORS, AVA DECOOPER WRIDE, SAMANTHA AGOSTIN, MELANIE SANCHEZ, ANNA WRIGHT, LAYLA COX, MCKENZIE KROEGER, AVA THAYER, SORYAH HART, EMILY HARTMAN, and CASSY LEWANDOWSKI,  Individually and on behalf of all those similarly situated, | Civil Action<br><br>Case No._____ |
| Plaintiffs,<br>v.<br><br>QUINNIPIAC UNIVERSITY, QUINNIPIAC UNIVERSITY BOARD OF TRUSTEES, MARIE HARDIN, and GREG AMODIO,<br><br>Defendants. | June 5, 2026 |

**<u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>**

This is an action based on long-standing and ongoing violations of Title IX of the Education Amendments of 1972 by Quinnipiac University, its Director of Athletics, President, and Board of Trustees (collectively "Defendants" or "QU"). On April 14, 2026, just two weeks before the end of classes and the beginning of final examinations, QU, through its administration and athletic leadership, announced its decision to eliminate its women's rugby team effective at the conclusion of the 2025-26 academic year. The decision is particularly troubling because women's varsity rugby was one of the very programs QU expanded and relied upon following prior Title IX litigation in this very Court concerning inequitable athletic participation opportunities for women. After years of representing the program as a cornerstone of QU athletics and celebrating its national success, Defendants abruptly informed student athletes and coaches that the program

1

would be terminated. The announcement blindsided the members of the women's rugby team, all of whom committed years of their academic, athletic, financial, and personal lives to QU and to one of the nation's premier Division I women's rugby programs. QU's women's rugby program has not only won national recognition but has also served as a pathway for Olympic-level athletic development, producing athletes who have brought extraordinary distinction and visibility to the University.

QU's decision has left these college athletes and recruits in an untenable position. While certain players may technically be permitted to remain enrolled at QU and retain some form of financial aid, that is not a meaningful solution for athletes who dedicated years of training, sacrifice, and personal commitment to competing at the collegiate level in the sport that they love. These women turned down opportunities at colleges and universities across the country to attend QU because of the opportunity to compete as members of its nationally recognized women's rugby program. They structured their academic, athletic, and personal lives around that opportunity. Requiring them to either abandon the sport they have spent years pursuing or uproot their lives with no notice, immediately before final examinations and the close of the academic year, is neither fair nor consistent with the protections guaranteed under Title IX. Women's varsity rugby has long provided female student athletes with varsity caliber benefits, treatment, services, support, competitive opportunities, and meaningful participation opportunities for female student athletes at QU. Defendants' decision to eliminate women's rugby against the backdrop of unequal treatment and benefits in its athletics program underscores both the harm to female student athletes and the retaliatory nature of the decision.

Accordingly, this action is brought by the female student athletes in their individual capacities and on behalf of all similarly situated present and future female student athletes at QU

to address and remedy QU's historic and ongoing pattern of retaliatory and discriminatory conduct.

**STATEMENT OF THE CASE**

1.      QU discriminates against women on the basis of sex by, among other things, providing female student athletes with unequal athletic benefits, treatment, services, resources, and support within its intercollegiate athletics program.

2.      QU's unequal treatment of female student athletes includes, but is not limited to, disparities in the benefits and support provided to women's teams and female athletes in areas such as coaching, training, facilities, equipment, scheduling, travel, medical and athletic training services, strength and conditioning, publicity, recruitment support, and competitive opportunities.

3.      Title IX concerns regarding QU's treatment of female athletes were raised repeatedly by the women's rugby coach and/or others. Some of those concerns related specifically to women's rugby, while others related more broadly to QU's treatment of female athletes and women's athletic programs.

4.      Rather than remedy the unequal benefits, treatment, services, resources, and support provided to female student athletes, QU moved to eliminate the women's varsity rugby team at the conclusion of the 2025–2026 academic year. If permitted to proceed, QU will terminate the women's varsity rugby program and eliminate all opportunities for women to compete in intercollegiate varsity rugby at the University.

5.      The administration of QU, including its President, Athletic Director, and Board of Trustees, has maintained that the decision to eliminate the women's varsity rugby team is final and irreversible.

6.      QU's decision to eliminate the women's varsity rugby team was made after protected Title IX activity by the women's rugby coach and/or others and constitutes retaliation

3

that harmed Plaintiffs and other female student athletes because of their association with the team and the Title IX concerns regarding QU's treatment of female athletes.

7.    QU's retaliatory elimination of the women's varsity rugby team also chills Plaintiffs, proposed class members, witnesses, and other students from raising, supporting, participating in, or pursuing Title IX complaints or this litigation.

8.    Plaintiffs seek to stop Defendants from continuing to retaliate and discriminate against them and similarly situated present and future female student athletes. Plaintiffs seek injunctive relief preventing Defendants from eliminating, downgrading, defunding, or otherwise discontinuing the women's varsity rugby program and requiring Defendants to provide female student athletes with equal athletic benefits, treatment, services, resources, and support free from sex discrimination and retaliation.

9.    Defendants' decisions to provide female student athletes with unequal athletic benefits, treatment, services, resources, and support, to eliminate the women's varsity rugby team after repeated Title IX concerns were raised by the women's rugby coach, and to retaliate against protected Title IX activity constitute sex discrimination and retaliation in violation of Title IX.

## JURISDICTION AND VENUE

10.    This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, and the regulations and policies promulgated pursuant to that law.

11.    This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331.

12.    Declaratory and other relief is authorized pursuant to 28 U.S.C. § 2201 and § 2202 to obtain the correct interpretation of the legal requirements described in this Complaint, which are necessary and appropriate to determine the respective rights and duties of the parties to this

action.

13.     Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(b) because the events from which Plaintiffs' claims arise occurred in Hamden, Connecticut, which is within the jurisdiction of this Court.

## THE PARTIES

## PLAINTIFFS

14.     The elimination of the QU women's rugby team impacted far more than a roster. For the student athletes affected, participation in collegiate rugby was the culmination of years of work, sacrifice, and personal commitment. All these young women trained for years with the goal of competing at the Division I level, structured their academic and personal lives around that pursuit, and chose QU over other opportunities because of the chance to be part of this unique program. The sudden decision to eliminate the team stripped away not only the current student athletes' opportunity to compete, but also dismantled a highly successful and tight-knit program, built over many years through the efforts of players, coaches, families, and hundreds of alumni who helped shape and sustain the QU women's rugby community. Although they are not parties to this action, the families, alumni, and former student athletes connected to the program are likewise experiencing the effects of QU's decision.

### *Plaintiff Reagan Perez*

15.     Plaintiff Reagan Perez is a sophomore at QU majoring in Criminal Justice and is a member of the women's varsity rugby team. Plaintiff Perez began attending QU in Fall 2025 and is from Manassas, Virginia.

16.     Rugby has played a deep personal role in Plaintiff Perez's life and development. Rugby provided Plaintiff Perez with an emotional outlet, support, and a sense of belonging.

17. Plaintiff Perez chose QU because of the reputation of the women's rugby program and the coaching staff that recruited and mentored her, and the program's connection to elite and Olympic-level rugby athletes. Plaintiff Perez believed QU offered the opportunity to continue pursuing elite rugby opportunities at the NCAA Division I level. Plaintiff Perez also intended to pursue professional rugby opportunities following college.

18. Following the elimination of the program, Plaintiff Perez is left with extremely limited financially viable transfer options. The only potential transfer opportunities Plaintiff Perez has been able to identify have limited roster space, limited scholarship funding, and are likely financially unattainable.

19. The elimination of the women's varsity rugby program caused severe harm. Plaintiff Perez lost her primary coping mechanism and support system, and she fears her rugby career may be over entirely.

### *Plaintiff Carolyn Melody*

20. Plaintiff Carolyn Melody is a freshman at QU majoring in Sports Communications and is a member of the women's varsity rugby team. Plaintiff Melody began attending QU in Fall 2025 and is from Emmitsburg, Maryland.

21. Plaintiff Melody was a three-time All-Conference player in high school, participated in three international rugby tours to Ireland with the Eagle Impact Rugby Academy ("EIRA") Select Side, earned recognition as an Elite Girl Rugby League ("EGRL") Select Side Player, and received the Dick Poulson Scholarship through the U.S. Rugby Foundation.

22. At QU, Plaintiff Melody maintained a 4.0 GPA with distinguished honors, earned a Quinnipiac Student Academic Award, and started all four matches in which she was eligible to compete before suffering an injury.

23.    Plaintiff Melody chose QU because the coaching staff believed in her potential as both a player and future leader. Plaintiff Melody expected to continue developing athletically and academically through QU's Division I rugby program and planned to utilize her remaining NCAA eligibility, including a redshirt year, to pursue an additional degree while continuing to compete at the Division I level.

24.    Plaintiff Melody now faces significant uncertainty regarding whether she can continue competing at the NCAA Division I level and has been forced to consider transferring schools or even changing sports entirely to preserve her collegiate athletic opportunities. Plaintiff Melody also faces the prospect of having to personally finance an additional year of education to use the remainder of her NCAA eligibility because QU's varsity rugby program no longer exists.

25.    Following the elimination of the program, Plaintiff Melody has suffered significant harm both personally and academically. The abrupt and unsupported way Defendants' decision was delivered fundamentally altered her sense of stability, purpose, and future at QU.

### *Plaintiff Anastasia Byrne*

26.    Plaintiff Anastasia Byrne is currently a senior in high school in Milwaukee, Wisconsin. She committed to attend QU as an incoming freshman for the 2026–27 academic year, where she intended to compete on the women's varsity rugby team at the NCAA Division I level.

27.    Plaintiff Byrne has devoted years of training and competition to becoming an elite rugby player. She earned significant success throughout her high school rugby career, including becoming a four-time Midwest champion and national rugby champion.

28.    Plaintiff Byrne spent countless hours evaluating collegiate opportunities and chose QU over other programs because of the university's academic opportunities, the reputation and legacy of its women's rugby program, and the relationships she built with the coaching staff and

7

future teammates during the recruiting process.

29.     Plaintiff Byrne committed to QU in reliance on the opportunity to compete in NCAA Division I varsity rugby with access to elite coaching, structured training, institutional support, and high-level competition. Plaintiff Byrne planned her academic and athletic future around the continuation of QU's Division I women's rugby program and expected to continue developing both personally and athletically through the program.

30.     The elimination of the varsity program deprives Plaintiff Byrne of the opportunity to compete at the highest collegiate level, limits her athletic development, and substantially impairs her future opportunities within competitive rugby. Plaintiff Byrne would not have committed to QU had she known Defendants intended to eliminate the women's varsity rugby program.

### *Plaintiff Georgia Brown*

31.     Plaintiff Georgia Brown is currently a senior in high school in Pleasanton, California. She committed to attend QU as an incoming freshman for the 2026–27 academic year, where she intended to major in civil engineering and compete on the women's varsity rugby team at the NCAA Division I level.

32.     Plaintiff Brown serves as captain of the California Grizzlies rugby team while also participating in USA Rugby development programs. Plaintiff Brown has worked extensively to earn the opportunity to compete at the Division I collegiate level. Plaintiff Brown underwent knee surgery and rehabilitation to return to competitive rugby and continue pursuing her goal of competing at the highest collegiate level possible.

33.     Plaintiff Brown chose QU because it offered the rare combination of Division I women's rugby, a civil engineering program, and sufficient scholarship support to make attendance financially possible for her and her family.

34.     Plaintiff Brown committed to QU in reliance on the opportunity to compete in NCAA Division I varsity rugby with access to elite coaching, structured training, institutional support, and high-level competition. Plaintiff Brown specifically chose QU over other schools because it was the only affordable institution offering both Division I women's rugby and her intended major. The only comparable institutions offering both rugby and civil engineering were primarily Ivy League schools that do not provide athletic scholarships and were financially unattainable for Plaintiff Brown.

35.     Because the recruiting cycle had effectively ended before Defendants announced the elimination of the program, Plaintiff Brown was left with no realistic alternative Division I rugby opportunities and no access to the NCAA transfer portal because she is not yet enrolled in college.

36.     Plaintiff Brown now faces the possibility of either abandoning her long-term goal of competing in Division I rugby or giving up the academic and financial opportunities she had carefully planned around at QU. Plaintiff Brown would not have committed to QU had she known Defendants intended to eliminate the women's varsity rugby program.

### *Plaintiff Regan Jackson*

37.     Plaintiff Regan Jackson is a sophomore at QU majoring in Mechanical Engineering with a concentration in Biology and is a member of the women's varsity rugby team. Plaintiff Jackson began attending QU in Fall 2024 and is from Frisco, Colorado.

38.     Plaintiff Jackson devoted years to developing as a competitive rugby player and earned recognition throughout her rugby career, including receiving a scholarship from her high school rugby program and being named the Most Improved Player during the 2025–2026 season at QU.

39. Plaintiff Jackson chose QU specifically to compete in NCAA Division I women's rugby and continue pursuing the sport at the collegiate level. Plaintiff Jackson had never heard of QU prior to being recruited to play rugby there but ultimately chose the university because of the significance of the rugby program, the team environment, and the opportunity to compete at a high level while pursuing her academic goals.

40. Plaintiff Jackson became an active member of the women's rugby program and helped contribute to the team's recent competitive success, including helping the team achieve a winning record in both her freshman and sophomore years. This included tying in their match against the defending national champions, Harvard, in one of the program's most meaningful competitive accomplishments during her time at QU.

41. Following the elimination of the program, Plaintiff Jackson was forced to enter the transfer portal and explore opportunities at primarily Division II, Division III, and lower-level Division I programs that do not provide the same level of athletic competition or academic opportunities available at QU.

42. Plaintiff Jackson has also suffered significant academic and personal harm because of the elimination of the varsity rugby program. Rugby provided critical structure, motivation, and emotional support throughout her college experience, and the loss of the program has negatively affected Plaintiff Jackson's academic, athletic, and mental wellbeing.

### *Plaintiff Macey Dunn*

43. Plaintiff Macey Dunn is a junior at QU majoring in Health, Medicine, and Society with a minor in Business and is a member of the women's varsity rugby team. Plaintiff Dunn began attending QU in Fall 2025 and is from Boise, Idaho.

44. In high school, Plaintiff Dunn won a state title, earned All-State honors, and was

named "Lady Rugby" runner-up. Plaintiff Dunn received athletic scholarship offers from both Central Washington University and QU, and chose to play for QU. Plaintiff Dunn recently earned the Bobcat Award for being an all-around key contributor to the team at QU.

45.    Rugby has played a significant role in Plaintiff Dunn's life. Rugby provided Plaintiff Dunn with the opportunity to attend college. Plaintiff Dunn transferred to QU after the rugby program at Central Washington University was eliminated.

46.    Plaintiff Dunn chose QU because of the support, mentorship, and opportunities provided through the women's varsity rugby program and expected to continue developing academically and athletically through participation in Division I rugby. Plaintiff Dunn planned to pursue an MBA while continuing to utilize her remaining NCAA eligibility and athletic scholarship support.

47.    Following the elimination of the program, Plaintiff Dunn explored transferring to continue competing at the Division I level, but she determined that transferring was financially unrealistic because comparable scholarship support was unavailable elsewhere.

48.    The elimination of the varsity rugby program has also deprived Plaintiff Dunn of the opportunity to continue pursuing her long-term goal of playing rugby professionally. Without the opportunity to continue competing and developing at the highest collegiate level, professional rugby opportunities become significantly less realistic.

### *Plaintiff Brooke Harnisch*

49.    Plaintiff Brooke Harnisch is currently a senior in high school in Pine, Colorado. She committed to attend QU as an incoming freshman for the 2026–2027 academic year, where she intended to major in Nursing and compete on the women's varsity rugby team at the NCAA Division I level.

11

50.     Plaintiff Harnisch served as team captain for the Colorado Lumberjackets 15-players and 7-players state championship teams in 2025, earned MVP Forward honors in 2024 and 2025, and was named MVP Forward during the 2025 EIRA rugby tour.

51.     Plaintiff Harnisch specifically chose QU because it offered the rare combination of a strong direct-admit nursing academic program, Division I women's rugby, and sufficient scholarship support to make attendance financially possible.

52.     Plaintiff Harnisch committed to QU in reliance on the opportunity to compete in NCAA Division I varsity rugby at what she believed to be an established and successful legacy rugby program with decorated coaches, and elite competition. Plaintiff Harnisch invested substantial time, effort, and resources into the recruiting process and declined other collegiate opportunities to attend QU as a Division I student-athlete.

53.     Following the elimination of the program, Plaintiff Harnisch was forced to restart the recruiting process with only weeks remaining before her high school graduation, even though most comparable Division I rugby rosters and direct-admit nursing programs were already full. Plaintiff Harnisch now faces significant uncertainty regarding whether she can find another institution that offers a comparable nursing program, sufficient financial aid, and the opportunity to continue competing at the Division I level.

54.     Plaintiff Harnisch also suffered personally because of the abrupt and unsupported way Defendants announced the elimination of the women's rugby program. Plaintiff Harnisch was preparing to move approximately 1,500 miles away from home to attend QU because she trusted the university to support both her academic and athletic future. Plaintiff Harnisch now fears that the university does not value or support women's athletics and she would not have committed to QU had she known Defendants intended to eliminate the women's varsity rugby program.

12

*Plaintiff Delilah Staberg*

55.    Plaintiff Delilah Staberg is a freshman at QU majoring in Criminal Justice and Political Science with a minor in Spanish and is a member of the women's varsity rugby team. Plaintiff Staberg began attending QU in Fall 2025 and is from Silverthorne, Colorado.

56.    Plaintiff Staberg devoted years to developing as a competitive rugby player and earned recognition as the Rookie of the Year during the 2025–26 season at QU.

57.    Plaintiff Staberg chose QU specifically because it offered the rare combination of prestigious academics and high-level NCAA Division I women's rugby. Plaintiff Staberg only considered Division I rugby programs during the recruiting process and would not have attended QU absent the opportunity to compete at the Division I level. Plaintiff Staberg intended to pursue extensive academic involvement at QU while continuing to develop athletically and eventually pursue opportunities to compete professionally in Women's Elite Rugby ("WER").

58.    Following the elimination of the program, Plaintiff Staberg was immediately forced into the transfer process to have the ability to continue competing at the DI level. Plaintiff Staberg now faces significant uncertainty regarding whether she must uproot her academic, athletic, and personal life to play varsity rugby.

59.    Plaintiff Staberg also suffered significant professional and educational harm because the elimination of the varsity rugby program disrupted her plans to pursue a career in law enforcement and compete professionally in rugby. Plaintiff Staberg relied upon Division I athletics not only for elite athletic development, but also because participation as a Division I athlete would provide meaningful advantages for future career opportunities and professional development. The structured training, physical conditioning, and athletic support services provided through the varsity rugby program were critical to her long-term goals and personal growth.

*Plaintiff Meilin Lemis*

60.     Plaintiff Meilin Lemis is currently a senior in high school in Simsbury, Connecticut. She committed to attend QU as an incoming freshman for the 2026–2027 academic year, where she intended to major in Criminal Justice and Psychology and compete on the women's varsity rugby team at the NCAA Division I level.

61.     Plaintiff Lemis has earned multiple awards in recognition of her athletic talent, including MVP Back of the Year honors twice, Most Valuable Player honors, and the Simsbury-Granby Rotary Club's Elmer Vincent Sports Award. Plaintiff Lemis also served as a captain for her high school rugby team and has developed strong leadership and mentorship skills through the sport.

62.     Rugby has provided Plaintiff Lemis with community, identity, accountability, and belonging unlike any other sport she previously played.

63.     Plaintiff Lemis chose QU because of its strong academics, the nationally recognized women's rugby program, and the opportunity to play Division I rugby under highly qualified coaches. QU was the first school she toured and immediately felt like home. Plaintiff Lemis also expected access to sports psychologists, athletic trainers, nutritionists, and other varsity support systems that she believed would help her continue developing both physically and mentally.

64.     Plaintiff Lemis committed to QU in reliance on the opportunity to compete in NCAA Division I varsity rugby and ceased pursuing other collegiate rugby opportunities. Following the elimination of the varsity rugby program, Plaintiff Lemis attempted to explore other collegiate rugby opportunities but was unable to meaningfully pursue alternative roster opportunities because most Division I programs were already full.

14

65. Plaintiff Lemis signed her national letter of intent with QU in November and was effectively prevented from pursuing other collegiate opportunities before Defendants announced the elimination of the varsity rugby program. Had she known the program was going to be eliminated she would not have committed to QU.

### Plaintiff Grace Hinton

66. Plaintiff Grace Hinton is a junior at QU majoring in Behavioral Neuroscience with a minor in Applied Statistics and Data Science and is a member of the women's varsity rugby team. Plaintiff Hinton began attending QU in Fall 2023 and is from Havre de Grace, Maryland.

67. Plaintiff Hinton devoted years to other sports and she fell in love when she discovered rugby during her junior year of high school. Plaintiff Hinton participated in numerous sports throughout her childhood, including lacrosse, soccer, swimming, field hockey, and dance, before attending a rugby clinic during high school and immediately developing a deep connection to the sport. Rugby provided Plaintiff Hinton with a unique sense of purpose, belonging, discipline, and identity unlike any sport she had previously played. Rugby's physicality, culture, and close-knit team environment helped shape her personal, academic, and professional development.

68. Plaintiff Hinton chose QU specifically because of the opportunity to play Division I rugby and an athletic scholarship made it possible for her to attend a four-year university while pursuing her specific academic goals.

69. Plaintiff Hinton had never heard of QU prior to visiting for a rugby game during high school but immediately felt connected to the program and committed because the university provided the opportunity to continue competing in the sport she loved while receiving a strong education.

70. Following the elimination of the program, Plaintiff Hinton experienced severe

academic and personal harm.

71.    Rugby provided her with the structure, accountability, and support system necessary for her to effectively manage her academic responsibilities, chronic health condition, and mental well-being. Without the women's varsity rugby program, Plaintiff Hinton fears losing her identity, support system, academic stability, and long-term professional opportunities.

72.    Plaintiff Hinton intended to complete her entire collegiate rugby career at QU and would not have attended the university, absent the opportunity to compete in Division I women's rugby.

### *Plaintiff Alexa Kirschner*

73.    Plaintiff Alexa Kirschner is a sophomore at QU majoring in Health Science on a pre-Physician Assistant track with a minor in Sports Medicine and is a member of the women's varsity rugby team. Plaintiff Kirschner began attending QU in Fall 2024 and is from Charlotte, North Carolina.

74.    Plaintiff Kirschner devoted years to developing as an elite rugby player and became a leader within QU's women's rugby program. Plaintiff Kirschner earned recognition as a MA Sorensen Award nominee, served as a team captain during the Fall 2025 and Spring 2026 seasons, received the Defensive Award in 2026, and holds the program's highest tackle record.

75.    Rugby provided Plaintiff Kirschner with community, leadership opportunities, identity, and personal development. Rugby taught her meaningful leadership skills and allowed her to help shape the culture and accountability standards within the women's rugby program.

76.    Plaintiff Kirschner chose QU because of its strong Health Science and Physician Assistant academic pathway while also allowing her to compete at the NCAA Division I level in women's rugby. Plaintiff Kirschner intended to continue pursuing both her academic and athletic

goals simultaneously and would not have attended QU absent the opportunity to compete in Division I women's rugby.

77.    Following the elimination of the program, Plaintiff Kirschner was forced to consider transferring schools or abandoning Division I athletics altogether because many comparable rugby programs do not provide the same academic opportunities she sought at QU. Plaintiff Kirschner also explored the possibility of attempting to compete in a different sport at QU because of her desire to remain a student-athlete, and the central role athletics played in her collegiate identity and future plans.

78.    In addition, Plaintiff Kirschner suffered significant academic and personal harm following Defendants' elimination of the varsity rugby program which caused significant stress and anxiety during an especially critical academic period involving numerous examinations and graduate school preparation. QU's actions threaten her long-term goal of attending graduate school and becoming a Physician Assistant.

### *Plaintiff Emma Perez*

79.    Plaintiff Emma Perez is a freshman at QU majoring in Nursing and is a member of the women's varsity rugby team. Plaintiff Perez began attending QU in Fall 2025 and is from Sacramento, California.

80.    Plaintiff Perez chose QU because of the structure, organization, mentorship, and accountability provided through the women's varsity rugby program in addition to the university's nursing program and scholarship support. Plaintiff Perez relied heavily upon the varsity rugby program as both an athletic opportunity and a source of stability, community, motivation, and personal identity.

81.    Rugby has provided her with purpose, confidence, belonging, and emotional

support unlike anything else in her life. Rugby is the foundation for her daily motivation and gives her direction and structure.

82.    Plaintiff Perez now feels trapped because transferring schools would delay her graduation by as much as two years due to the rigid curriculum and credit-transfer limitations associated with nursing programs. There are very few rugby opportunities available at schools with a nursing program, and most comparable collegiate rosters as well as alternative nursing programs were already full by the time Defendants announced the elimination of the varsity rugby program.

83.    Rugby has provided Plaintiff Perez's central support system and community, which helped her while living far away from home. The elimination of the program has taken away a significant part of her identity and future.

84.    Plaintiff Perez further experienced educational and financial harm because Defendants' decision forced her to choose between abandoning her long-term goal of competing in Division I rugby or risking substantial academic setbacks and additional expenses associated with transferring nursing programs. Plaintiff Perez would not have attended QU without the opportunity to compete in Division I women's rugby. Defendants' decision has forced Plaintiff Perez to choose between abandoning her long-term goal of competing in Division I rugby or risking substantial academic setbacks, additional educational expenses, delayed graduation, and disruption to her nursing education.

### *Plaintiff Morgan Saylors*

85.    Plaintiff Morgan Saylors is currently a high school senior in Sacramento, California. She committed to attend QU as an incoming freshman for the 2026–2027 academic year, where she intended to compete on the women's varsity rugby team at the NCAA Division I level.

86.    Plaintiff Saylors has competed in USA Rugby development pathways, trained as part of the USA Rugby U18 camp program, and intended to continue pursuing elite rugby opportunities at the collegiate and national levels.

87.    Rugby provided Plaintiff Saylors with community, structure, belonging, and purpose. Rugby helped her mature personally while teaching her resilience, discipline, and teamwork.

88.    Plaintiff Saylors chose QU because of the women's varsity rugby program, the coaching staff, and the opportunity to continue developing as a Division I athlete. Plaintiff Saylors committed to QU in reliance on the opportunity to compete at the highest collegiate level in a nationally respected rugby program.

89.    Following the elimination of the varsity rugby program, Plaintiff Saylors attempted to explore other collegiate rugby opportunities but was unable to secure alternative roster opportunities because most comparable Division I programs were already full. Plaintiff Saylors has lost the opportunity to compete at the highest collegiate level possible despite years of work devoted to that goal.

90.    The elimination of the varsity rugby program significantly disrupted Plaintiff Saylors' senior year of high school, negatively impacted her academic focus, and jeopardized her long-term athletic aspirations, including future opportunities to compete within USA Rugby national team pathways. Plaintiff Saylors expected QU's Division I rugby program to provide continued athletic development, elite competition, and exposure necessary to pursue higher levels of competition within the sport.

***Plaintiff Ava deCooper Wride***

91.     Plaintiff Ava deCooper Wride is a freshman at QU majoring in Sports Management and is a member of the women's varsity rugby team. Plaintiff deCooper Wride began attending QU in Fall 2025 and is from Norwich, England.

92.     Plaintiff deCooper Wride spent the majority of her childhood developing as an elite rugby player and achieved significant athletic success before attending QU. Plaintiff deCooper Wride began playing rugby at seven years old and, after discovering there was no girls' rugby program at her local club, helped create what became the Norwich Wildcats girls' rugby program. Plaintiff deCooper Wride later represented her county in England and competed within the England rugby pathway system for Saracens. At QU, Plaintiff deCooper Wride earned a USA scholarship and won the Coaches' Player Award during her freshman season.

93.     Rugby has played a significant role in Plaintiff deCooper Wride's life and identity. Rugby taught her determination, leadership, and perseverance through difficult circumstances. Moving to the United States to attend QU was an enormous personal and emotional transition for Plaintiff deCooper Wride, and the women's rugby program became her support system, community, and home while adapting to a new country and culture.

94.     Plaintiff deCooper Wride chose QU because of the culture, history, and reputation of the women's varsity rugby program, as well as the opportunity to compete at the NCAA Division I level while pursuing her academic goals. Plaintiff deCooper Wride was drawn to QU because of the intense sense of pride and legacy within the rugby program and believed the university would support both her athletic and personal development.

95.     Plaintiff deCooper Wride is now considering transferring schools despite limited comparable rugby opportunities and uncertainty regarding whether she can secure scholarship support comparable to what QU provided. The elimination of the varsity rugby program

20

significantly disrupted both her educational plans and long-term rugby development after she had already successfully transitioned to life in the United States and established herself within the QU community.

96.    Plaintiff deCooper Wride further experienced severe personal harm because of Defendants' elimination of the women's varsity rugby program. Plaintiff deCooper Wride experienced anxiety, stress, and uncertainty regarding her future after learning that the program she moved across the world to join was being eliminated.

### Plaintiff Samantha Agostin

97.    Plaintiff Samantha Agostin is a junior at QU majoring in Health Science in the university's Doctor of Physical Therapy track with minors in Sports Medicine and Spanish and is a member of the women's varsity rugby team. Plaintiff Agostin began attending QU in Fall 2023 and is from Trumbull, Connecticut.

98.    Plaintiff Agostin earned significant academic and athletic success throughout her time at QU. Plaintiff Agostin earned recognition as Student Athlete of the Week in October 2025, was named a Scholar Athlete during the 2024–2025 and 2025–2026 academic years and received NIRA All-Academic honors in both 2025 and 2026. Plaintiff Agostin also helped lead QU's women's rugby program to a NIRA third-place finish during the 2023 season.

99.    Plaintiff Agostin founded her high school girls' rugby team during her junior year of high school with the goal of creating a close-knit and supportive community for young women athletes.

100.    Plaintiff Agostin chose QU because it offered the rare combination of a strong academic environment, a direct pathway toward her Doctor of Physical Therapy degree, and the opportunity to compete in NCAA Division I women's rugby within a close-knit team culture that

21

immediately felt like home to her. Plaintiff Agostin intended to continue competing in rugby for as long as possible while also pursuing her professional goal of becoming a neurological inpatient physical therapist.

101.    Plaintiff Agostin lost the opportunity to complete her anticipated senior season and finish the four-year collegiate athletic career for which she had physically, emotionally, and academically sacrificed. The loss of the coaches, teammates, and support system she relied upon throughout her collegiate experience has left Plaintiff Agostin feeling isolated and alone in pursuing both her academic and athletic future.

### *Plaintiff Melanie Sanchez*

102.    Plaintiff Melanie Sanchez is a sophomore at QU majoring in Nursing with a minor in Spanish and is a member of the women's varsity rugby team. Plaintiff Sanchez began attending QU in Fall 2024 and is from Milwaukee, Wisconsin.

103.    Plaintiff Sanchez earned recognition throughout her athletic career, including receiving the Coaches Award while competing at QU. Plaintiff Sanchez initially began playing rugby in high school and quickly developed a passion for the sport after coaches and mentors invested heavily in her development and encouraged her to pursue higher levels of competition. Plaintiff Sanchez advanced to the varsity level in high school and competed on championship teams.

104.    Rugby gave Plaintiff Sanchez confidence, identity, and purpose while also helping her achieve educational opportunities that no one else in her family had previously attained. Rugby was the foundation that grounded her emotionally while living far away from home and pursuing the demanding academic requirements associated with nursing school.

105.    Plaintiff Sanchez chose QU because of its strong nursing program, financial

22

support, and the opportunity to compete in NCAA Division I women's rugby under a supportive coaching staff. Plaintiff Sanchez intended to continue pursuing her long-term professional goals of becoming a nurse and eventually attending graduate school to become a Certified Registered Nurse Anesthetist ("CRNA") while remaining a Division I student-athlete.

106. Plaintiff Sanchez now feels stuck because the rigid curriculum structure associated with nursing programs makes transferring schools impossible without significantly delaying her graduation. Transferring schools could cause her to lose as much as two years of academic progress if she attempted to continue competing collegiately elsewhere.

107. The loss of rugby stripped away a critical part of Plaintiff Sanchez's identity, support system, and sense of purpose while she was living away from home. She feels isolated and emotionally destabilized after losing the sport that had grounded her throughout her collegiate experience and helped motivate her academic and professional success.

### *Plaintiff Anna Wright*

108. Plaintiff Anna Wright is a sophomore at QU majoring in Health Science with a concentration in Sports Medicine and is a member of the women's varsity rugby team. Plaintiff Wright began attending QU in Fall 2024 and is from Cameron Park, California.

109. At QU, Plaintiff Wright earned the team's Defensive Award, Rookie of the Year Award, and MVP Award while competing at the NCAA Division I level. Plaintiff Wright relied upon athletic scholarships and varsity athletics opportunities to support her collegiate and professional development.

110. Plaintiff Wright chose QU because of the opportunity to compete in Division I women's rugby while receiving a strong education and access to varsity athletic facilities and resources, including the gym, field, and weight room. Plaintiff Wright intended to continue

competing at the Division I level throughout her collegiate career and hoped to continue playing rugby beyond college.

111.    Following the elimination of the program, Plaintiff Wright was forced to consider returning to California and attempting to find another collegiate rugby opportunity despite significant uncertainty regarding comparable athletic, academic, and financial opportunities elsewhere.

112.    Defendants' elimination of the women's varsity rugby program may delay her graduation and impose significant additional educational expenses and debt. Plaintiff Wright fears that transferring schools could cause academic setbacks that would require her to remain in school longer than originally planned.

### *Plaintiff Layla Cox*

113.    Plaintiff Layla Cox is a sophomore at QU majoring in Film with a concentration in Sports Studies and is a member of the women's varsity rugby team. Plaintiff Cox began attending QU in Fall 2024 and is from Hampstead, Maryland.

114.    Plaintiff Cox earned recognition as a two-time All-American, was named Offensive Player of the Year for the QU women's rugby team and received NCAA Division I honorable mention recognition. Plaintiff Cox also helped contribute to some of the most successful periods in QU women's rugby history, including helping the program tie the reigning champions and contributing to the program reaching ninety-nine wins during its existence.

115.    Rugby fundamentally changed Plaintiff Cox as a person and provided her with purpose, belonging, confidence, and emotional support. Rugby was the one sport that allowed Plaintiff Cox to succeed regardless of her economic background. Rugby also provided Plaintiff Cox with a close-knit support system and a pathway toward academic, professional, and athletic

24

opportunities she otherwise would not have had.

116.   QU uniquely aligned with Plaintiff Cox's academic and athletic ambitions by allowing her to pursue multiple degrees while continuing to compete at the NCAA Division I level. Plaintiff Cox believed the women's rugby program represented a strong legacy program capable of competing at the highest levels of collegiate rugby.

117.   Following the elimination of the program, Plaintiff Cox was forced to enter the NCAA transfer portal despite wanting to remain at QU because it was the only option for her to continue to compete at a high collegiate level and potentially pursue professional rugby opportunities in the future.

118.   The elimination of the varsity rugby program jeopardized Plaintiff Cox's long-term athletic and professional aspirations by depriving her of the exposure, development, and competition necessary to continue pursuing elite rugby opportunities. QU's women's rugby program provided a critical platform for athletic visibility, career development, and personal growth while simultaneously allowing her to pursue her unique academic and professional ambitions in film, sports, and media.

### *Plaintiff McKenzie Kroeger*

119.   Plaintiff McKenzie Kroeger is a sophomore at QU pursuing studies in Business Analytics with a minor in Economics and is a member of the women's varsity rugby team. Plaintiff began attending QU in Fall 2024 and is from Rescue, California.

120.   Plaintiff Kroeger devoted years to athletics and rugby before attending QU and earned significant scholarship support through her athletic ability, work ethic, and perseverance. Plaintiff Kroeger also became a starter during both her freshman and sophomore seasons at QU and scored multiple tries while competing at the NCAA Division I level.

25

121.    Rugby has played an extraordinarily important and life-changing role in Plaintiff Kroeger's personal development and emotional wellbeing. Rugby gave Plaintiff Kroeger a family, purpose, and emotional support during significant personal struggles.

122.    Plaintiff Kroeger chose QU because it offered substantial scholarship support, a strong education, and the opportunity to compete in NCAA Division I women's rugby at a level unavailable to her at comparable institutions. Many of the Ivy League institutions that compete within QU's rugby conference were unavailable to Plaintiff Kroeger, and QU therefore represented a unique opportunity for both her academic and athletic future.

123.    Plaintiff Kroeger has extremely limited transfer opportunities because comparable schools cannot provide equivalent scholarship support, educational opportunities, or rugby competitions. QU's elimination of the women's rugby program deprived her of the sport and support system that had become central to her emotional well-being.

### Plaintiff Ava Thayer

124.    Plaintiff Ava Jane Thayer is currently a high school senior in Wexford, Pennsylvania. She committed to attend QU as an incoming freshman for the 2026–2027 academic year, where she intended to major in Criminal Justice and Psychology and compete on the women's varsity rugby team at the NCAA Division I level.

125.    Plaintiff Thayer served as captain for both her high school team and select-side rugby teams, earned Rookie of the Year and Player of the Year honors, competed in USA Rugby U18 programs and national championship competitions, and won multiple regional and national rugby championships.

126.    Rugby provided Plaintiff Thayer with purpose, belonging, emotional support, leadership opportunities, and lifelong relationships. Rugby's inclusive and highly competitive

environment helped shape her character, mental resilience, and personal growth while teaching her valuable life skills and discipline.

127. Plaintiff Thayer chose QU because of the reputation and legacy of the women's varsity rugby program, the team culture, the competitive opportunities available at the NCAA Division I level, and the academic opportunities provided by the university. Plaintiff Thayer specifically committed to QU in reliance on the opportunity to compete in Division I women's rugby at a well-established and nationally respected program while receiving scholarship support.

128. Following the elimination of the program, Plaintiff Thayer was forced to restart the recruiting process extremely late in the recruiting cycle and pursued transfer opportunities at other institutions, including Sacred Heart University, despite receiving significantly less scholarship support.

129. Defendants' abrupt elimination of the varsity rugby program harmed Plaintiff Thayer personally and academically by creating uncertainty and instability regarding both her academic and athletic future. Plaintiff Thayer had to reconsider her collegiate future with extremely limited time remaining before the end of her senior year of high school. The timing of QU's decision left her with almost no meaningful opportunity to secure comparable Division I athletic and academic alternatives.

### Plaintiff Soryah Hart

130. Plaintiff Soryah Hart is a freshman at QU majoring in Marketing and is a member of the women's varsity rugby team. Plaintiff Hart began attending QU in Fall 2025 and is from Brownsburg, Indiana.

131. Rugby helped Plaintiff Hart discover who she was as a person, provided her with purpose and direction, and helped shape her into a stronger and more confident individual both on

and off the field. The women's rugby program became a second home and family for Plaintiff Hart during their time at QU.

132.   The sense of belonging, support, and team culture within the women's rugby program played a significant role in Plaintiff Hart's decision to attend QU and continue competing at the NCAA Division I level.

133.   Following the elimination of the varsity rugby program, Plaintiff Hart was forced to explore potential transfer opportunities and is uncertain whether transferring will preserve her academic, financial, and athletic opportunities.

134.   The elimination of the varsity rugby program caused Plaintiff Hart personal and academic harm because rugby was the primary reason she attended college and served as the foundation for her sense of purpose, identity, and future direction. Plaintiff Hart felt lost, uncertain regarding her future, and emotionally destabilized after learning that the women's varsity rugby program was being eliminated.

### *Plaintiff Emily Hartman*

135.   Plaintiff Emily Hartman is a freshman at QU majoring in Health Sciences and is a member of the women's varsity rugby team. She began attending QU in Fall 2025 and is from Carmichael, California.

136.   Plaintiff Hartman spent years pursuing her goal of becoming an NCAA Division I athlete. She began playing rugby in eighth grade. Despite sustaining and recovering from multiple injuries, she continued competing at a prominent level, including on an All-Star rugby team in California.

137.   Plaintiff Hartman chose QU because of its nationally recognized women's rugby program, academic reputation, and health sciences and nursing-related academic opportunities.

28

Because of the elimination of the program, she may have to transfer to another institution with a Division I rugby program. QU's decision has forced Plaintiff Hartman to reconsider her academic and athletic future after she had already relocated more than 2,500 miles from home and established housing, friendships, and support systems at QU.

138.    Plaintiff Hartman suffered significant personal and academic harm following the elimination of the varsity rugby program. She lost access to the varsity athletic resources, including athletic training, sports psychology services, and nutritional counseling, which are important to her physical rehabilitation and overall well-being.

### *Plaintiff Cassy Lewandowski*

139.    Plaintiff Cassy Lewandowski is currently a high school senior in Waukesha, Wisconsin. She committed to attend QU as an incoming freshman for the 2026–2027 academic year, where she intended to pursue a degree in Nursing and compete on the women's varsity rugby team at the NCAA Division I level.

140.    Plaintiff Lewandowski achieved substantial athletic success throughout her high school rugby career. Plaintiff Lewandowski earned multiple "Player of the Game" honors, was named "Rugger of the Year," received All-State recognition three times, and earned both academic and athletic scholarships.

141.    Rugby has played an important role in Plaintiff Lewandowski's personal development as well. Rugby taught her life lessons, helped her build lasting relationships, and became an important source of community, belonging, and personal growth throughout her high school experience.

142.    Plaintiff Lewandowski chose Quinnipiac because it offered the opportunity to compete in NCAA Division I women's rugby while pursuing a quality nursing degree. After high

29

school, Plaintiff Lewandowski wanted to continue competing at the Division I level and believed Quinnipiac provided the ideal balance of academics, athletics, scholarship support, and community. Quinnipiac's women's rugby program and coaching staff made the university feel like the right place for her future development both academically and athletically.

143.    The elimination of the varsity rugby program jeopardized the athletic opportunities, structure, and support system she relied upon when committing to Quinnipiac and planning her collegiate future.

## DEFENDANTS

### *Defendant Quinnipiac University*

144.    Defendant Quinnipiac University is a private university located in Hamden, Connecticut.

145.    QU receives federal financial assistance and is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its implementing regulations.

146.    QU operates an intercollegiate athletics program, including varsity athletic teams for men and women.

147.    QU provides student athletes with athletic benefits, treatment, services, resources, support, and athletic financial assistance through its intercollegiate athletics program.

148.    QU is responsible for ensuring that its intercollegiate athletics program complies with Title IX and does not discriminate or retaliate on the basis of sex.

### *Defendant Quinnipiac University Board of Trustees*

149.    Defendant Quinnipiac University Board of Trustees is the governing body of QU.

150.    The Board of Trustees has authority over the care, control, and disposition of QU's property and funds and the general management of the University's affairs.

151.    The Board of Trustees is responsible for ensuring that QU complies with federal and state law, including Title IX.

152.    Upon information and belief, the Board of Trustees knew or should have known of the discriminatory and retaliatory conduct alleged in this Complaint and approved, ratified, authorized, or permitted the elimination, defunding, downgrading, or discontinuation of the women's varsity rugby program.

### *Defendant Marie Hardin*

153.    Defendant Marie Hardin is the President of QU.

154.    As President, Defendant Hardin is responsible for the administration, management, and operation of QU, including ensuring compliance with federal and state civil rights laws.

155.    Upon information and belief, Defendant Hardin had authority over, participated in, approved, ratified, authorized, or permitted the decision to eliminate, defund, downgrade, or discontinue the women's varsity rugby program.

156.    Upon information and belief, Defendant Hardin knew or should have known of QU's unequal treatment of female student athletes and of Title IX-related concerns regarding QU's treatment of female athletes.

### *Defendant Greg Amodio*

157.    Defendant Greg Amodio is the Director of Athletics at QU.

158.    As Director of Athletics, Defendant Amodio is responsible for overseeing QU's intercollegiate athletics program, including the allocation of athletic benefits, treatment, services, resources, support, recruiting resources, athletic financial assistance, and team funding.

159.    Defendant Amodio is responsible for ensuring that QU's intercollegiate athletics program provides female student athletes and women's teams with equal athletic benefits,

treatment, services, resources, and support.

160. Upon information and belief, Defendant Amodio participated in, approved, ratified, authorized, or permitted the decision to eliminate, defund, downgrade, or discontinue the women's varsity rugby program.

161. Upon information and belief, Defendant Amodio knew or should have known of QU's unequal treatment of female student athletes and of Title IX-related concerns regarding QU's treatment of female athletes before QU announced the elimination of the women's varsity rugby program.

162. QU, the Board of Trustees, Hardin, and Amodio acted individually and/or through their agents, employees, officers, representatives, and persons acting in concert with them in committing the acts alleged in this Complaint.

## ALLEGATIONS AS TO THE PLAINTIFF CLASS

163. The named Plaintiffs bring this action on behalf of themselves and on behalf of a class of all those similarly situated both now and in the future pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).

164. The Plaintiffs seek to represent a class of all present and future female students at QU who are harmed by QU's unequal provision of athletic benefits, treatment, services, resources, and support to female student athletes and male student athletes.

165. The Plaintiffs also seek to represent female student athletes and prospective student athletes who are harmed by QU's retaliation for protected Title IX activity, including downgrading, defunding, or discontinuation of the women's varsity rugby team in response to Title IX concerns that were raised regarding QU's treatment of female athletes.

32

166. Plaintiffs also seek to represent female students and prospective female student athletes who are deterred from enrolling at or participating in QU athletics because of QU's unequal treatment of female student athletes or because of QU's retaliation against protected Title IX activity.

167. Each of the named Plaintiffs is a member of the proposed class and has been or will be injured by QU's sex discrimination and retaliation in its varsity athletic program.

168. QU's announced elimination of the women's varsity rugby program will exacerbate the harm to female student athletes by depriving Plaintiffs and class members of equal athletic benefits, treatment, services, resources, support, and competitive opportunities within QU's intercollegiate athletics program, and by chilling Plaintiffs, class members, witnesses, and other female student athletes from raising, supporting, participating in, or pursuing Title IX concerns or complaints.

169. The Plaintiffs seek to represent the proposed class because joinder of all class members and all persons harmed by the ongoing sex discrimination in Defendants' varsity athletic program is not only impracticable, but impossible.

170. The proposed class is known to exist, but the identity of its members is and will continue to change without specific names during this litigation because of the nature of college enrollment and athletic participation. Students at QU aim to graduate four years after they matriculate. As of the date of filing, athletes are eligible for only four years, according to the rules of the NCAA. Accordingly, the members of the class harmed by QU's discriminatory actions constantly change as each class of students graduates, new students enroll, and student athletes join or leave varsity teams.

171. Not all members of the proposed class are currently identifiable because the class includes future students who will enroll at QU during this litigation and who will be subject to QU's policies, practices, and decisions regarding athletic benefits, treatment, services, resources, support, and retaliation.

172. Not all members of the proposed class are currently identifiable because the class includes female student athletes across QU's varsity athletics program who are affected by unequal benefits, treatment, services, resources, and support, not only members of the women's rugby team.

173. Joinder is impracticable because the class includes members whose identities are not currently known, including present and future female student athletes who are or will be affected by QU's unequal provision of athletic benefits, treatment, services, resources, and support.

174. Joinder is impracticable because the class includes present and future female student athletes who are or will be affected by QU's retaliation for protected Title IX activity and by the chilling effect of that retaliation.

175. Joinder is also impracticable because of the inherently fluid nature of the proposed class. Even though the proposed class is known to exist, the identities of its members will change during this litigation due to the nature of college enrollment and athletic participation. Accordingly, the membership of the class harmed by Defendants' sex discrimination constantly changes as students graduate from QU and as new classes/groups of graduating high school students enroll as freshmen at QU.

176. The Plaintiffs satisfy the "commonality" requirement of Federal Rule of Civil Procedure 23(a)(2) because they share questions of law and fact in common with the proposed class, including whether QU provides female student athletes equal athletic benefits, treatment,

34

services, resources, and support; whether QU retaliated for protected Title IX activity by eliminating, downgrading, defunding, or discontinuing the women's varsity rugby team; and whether QU's conduct chills female student athletes and others from raising or supporting Title IX concerns.

177. The Plaintiffs satisfy the "typicality" requirement of Federal Rule of Civil Procedure 23(a)(3) because their claims are typical of those of the proposed class. Plaintiffs and members of the proposed class have been, are being, or will be subjected to QU's unequal provision of athletic benefits, treatment, services, resources, and support, and are harmed by QU's retaliatory conduct and the chilling effect of that conduct.

178. The Plaintiffs are members of the proposed class and will fairly and adequately represent the interests of the class pursuant to Federal Rule of Civil Procedure 23(a)(4). They intend to prosecute this action vigorously to secure fair and adequate injunctive relief for the entire class.

179. The Plaintiffs satisfy Federal Rule of Civil Procedure 23(b)(2) because QU has acted or refused to act on grounds generally applicable to the proposed class by providing unequal athletic benefits, treatment, services, resources, and support to female student athletes and by retaliating for protected Title IX activity, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole.

180. Undersigned counsel has devoted substantial and sufficient efforts to identify and investigate potential claims in this action, to developing knowledge of the applicable law, and has sufficient resources to commit to representing this putative class as interim counsel under Federal Rule of Civil Procedure 23(g)(3) until such time as this Court determines whether to certify the action as a class action.

**GENERAL ALLEGATIONS**

***The Department of Education Interpretations of Title IX Compliance***

181.    Title IX requires in relevant part at 20 U.S.C. § 1681(a):

No person in the United States shall, on the basis of sex, be excluded from participation in,

be denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance.

182.    QU's intercollegiate athletics program, including women's varsity rugby, is part of

QU's education program or activity subject to Title IX.

183.    Title IX's implementing regulations identify ten non-exclusive areas in which

recipients must provide equal athletic opportunity. These include:

> 1. Whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes;
> 2. The provision of equipment and supplies;
> 3. Scheduling of games and practice time;
> 4. Travel and per diem allowance;
> 5. Opportunity to receive coaching and academic tutoring;
> 6. Assignment and compensation of coaches and tutors;
> 7. Provision of locker rooms, practice, and competitive facilities;
> 8. Provision of medical and training services;
> 9. Provision of housing and dining facilities and services; and
> 10. Publicity.

34 C.F.R. § 106.41(c).

184.    The OCR Policy Interpretation sets forth three areas of compliance under Title IX:

(1) effective accommodation of student interests and abilities; (2) equal athletic financial

assistance; and (3) equal treatment and benefits for athletic teams.

185.    Additionally, "[e]qual efforts to recruit male and female athletes are required under

Title IX." *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1110–11 (S.D. Cal.

2012) (citing Policy Interpretation, 44 Fed. Reg. at 71,417).

36

186.    "Although recruiting is not listed as a factor under 34 C.F.R. section 106.41(c), the Policy Interpretations do identify this area as significant." *Barrett v. W. Chester Univ. of Pennsylvania of State Sys. of Higher Educ.*, No. CIV.A. 03-CV-4978, 2003 WL 22803477, at *6 (E.D. Pa. Nov. 12, 2003) (citing *Cohen v. Brown Univ.*, 809 F. Supp. 978, 997 (D. R.I.1992) (identifying recruiting dollars as a "target area" under the Policy considerations and finding a disparity in Brown University's allocation of those funds)).

187.    The items listed above are not exhaustive and do not include every area in which a school must provide equal treatment and benefits to its female and male student athletes, but they provide a good overview of the areas to be examined.

188.    In addition, a school's "failure to provide necessary funds for teams for one sex" may also be indicative of sex discrimination. 34 C.F.R. § 106.41(c).

189.    The OCR Policy Interpretation states, among other things, OCR's interpretation of the equal treatment and benefits provisions quoted above:

> The Policy—The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible.

44 Fed. Reg. 71,415.

190.    Title IX's prohibition on retaliation was recognized and emphasized by the U.S. Supreme Court in *Jackson*, 544 U.S. at 178: "[T]he text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional 'discrimination' 'on the basis of sex.'" *See also* 34 C.F.R. § 106.71 ("No

recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX[.]").

191.    As the Supreme Court explained, such retaliation "is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Jackson*, 544 U.S. at 174.

192.    The Supreme Court said it would be "difficult, if not impossible" to achieve Title IX's goal of protecting citizens from discriminatory practices "if persons who complain about sex discrimination did not have effective protection against retaliation." *Id.* at 180–81 (noting that, without protection against retaliation, "individuals who witness discrimination would likely not report it . . . and the underlying discrimination would go unremedied").

193.    "Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished." *Id.* at 180.

194.    The Second Circuit likewise recognizes retaliation claims under Title IX. *See Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81, 91–92 (2d Cir. 2011).

195.    Protected Title IX activity includes raising concerns, complaints, or objections regarding sex discrimination affecting female students or female student athletes.

196.    Protected Title IX advocacy may be undertaken by coaches or other advocates who raise concerns regarding discrimination affecting students or student athletes. *See Ollier v. Sweetwater Union High School District*, 768 F.3d 843 (9th Cir. 2014).

197.    Retaliatory conduct violates Title IX by chilling protected activity, including conduct that would deter students, student athletes, witnesses, coaches, parents, or others from raising, supporting, participating in, or pursuing Title IX concerns or complaints.

## FACTUAL ALLEGATIONS

198.    As of the beginning of the 2025-26 academic and sports calendar, QU sponsors

38

men's and women's teams, including men's baseball, men's and women's basketball, men's and women's cross country, women's golf, women's acrobatics and tumbling, men's and women's ice hockey, women's softball, men's and women's soccer, men's and women's tennis, men's and women's lacrosse, women's track and field, women's field hockey, women's volleyball, and women's rugby.

199.    QU is a member of the NCAA and the Metro Atlantic Athletic Conference ("MAAC") for all sports except men's and women's hockey, which compete in the Eastern College Athletic Conference ("ECAC"); women's rugby, which competes in the NIRA; women's acrobatics and tumbling, which competes in the National Collegiate Acrobatics & Tumbling Association ("NCATA"); and women's field hockey, which competes in the Big East Conference. QU participates in Division I, the highest level of intercollegiate competition.

200.    QU provides members of its varsity athletic teams with athletic financial assistance, including, but not limited to, scholarships and grants-in-aid, and with athletic benefits, treatment, services, resources, and support subject to Title IX's equal-treatment requirement.

201.    In July 2010, following a trial on the merits, QU was found to be in violation of Title IX's requirement to provide equal athletic participation opportunities. *See Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 114 (D. Conn. 2010), *aff'd*, 691 F.3d 85 (2d Cir. 2012). As a result of that trial loss, QU took several steps over the next year to provide more varsity athletic participation opportunities to women, including adding a women's varsity rugby program. *See Biediger v. Quinnipiac Univ.*, No. 3:09-cv-00621, ECF No. 225-1, at 2 (Dec. 22, 2011) (Def. Mot. to Lift Injunction) (asking the Court to lift the injunction because, among other things, "Quinnipiac added a varsity women's rugby team in 2011-12").

202.    In 2013, QU entered into a consent decree ("2013 Consent Decree") which required

the university to, among other things, provide equal treatment and benefits to its men's and women's varsity athletic programs and promote women's rugby as a varsity sport and encourage other NCAA Division I programs to sponsor women's varsity rugby teams.

203.    The Plaintiffs chose to attend QU to participate on the women's varsity rugby team. They expected to participate on the team throughout their enrollment at QU and planned their academic, personal, athletic, and financial lives accordingly. They would not have enrolled at QU but for the opportunity to participate in women's varsity rugby and the benefits, services, resources, and support associated with varsity participation at QU.

204.    QU's women's varsity rugby team has provided female student athletes with the benefits, treatment, services, support, and competitive opportunities associated with Division I varsity athletics.

205.    On April 14, 2026, QU announced that it will no longer support women's varsity rugby after the conclusion of the 2025-26 academic year.

206.    QU made this announcement after current student athletes had already structured their academic, athletic, housing, financial, and personal plans around returning to the women's varsity rugby program for the following academic year.

207.    QU also made this announcement after incoming recruits had committed to QU based on the opportunity to compete for its women's varsity rugby program and after many transfer, admissions, recruiting, and roster opportunities at comparable programs had already closed or narrowed.

208.    The timing of QU's announcement left student athletes and incoming recruits with little meaningful opportunity to identify, pursue, and secure comparable academic and athletic opportunities elsewhere before the end of the academic year.

40

209. QU knew or should have known that pending or proposed NCAA eligibility changes could make delay itself harmful to freshmen, incoming recruits, international students, and other student athletes whose eligibility depends on timely access to varsity roster opportunities.

210. The timing of QU's announcement is especially harmful because of pending NCAA Division I eligibility changes that are expected to be adopted or implemented immediately. Upon information and belief, the NCAA is considering new eligibility rules, including a potential "five years to play five seasons" model and age-based eligibility restrictions affecting student athletes who begin college athletics after turning nineteen. If adopted or applied, these rules could materially affect incoming freshmen, international student athletes, transfer students, and other athletes whose ability to preserve eligibility depends on timely access to varsity roster opportunities.

211. The eligibility risk is not limited to potential NCAA rule changes. Pending federal legislation, including the proposed Protect College Sports Act, further underscores the changing eligibility landscape and could independently affect the time available for student athletes to compete at the varsity level. Among other things, the proposed legislation would create a maximum five-calendar-year eligibility period beginning after the earliest of a student's nineteenth birthday, actual high school graduation date, expected high school graduation date, or full-time enrollment at an institution, subject to limited exceptions.

212. Regardless of whether any particular NCAA rule or federal proposal is adopted, QU's delay in announcing the elimination of women's varsity rugby places in jeopardy Plaintiffs' and incoming recruits' eligibility, roster opportunities, and competitive seasons that cannot be restored after final judgment. Because Plaintiffs and recruits committed to QU in reliance on

41

varsity women's rugby, QU's late announcement leaves them attempting to find replacement opportunities after recruiting, admissions, scholarship, roster, and eligibility decisions at other institutions have already substantially closed.

213.   These eligibility consequences are particularly acute for freshmen and incoming student athletes. If the NCAA adopts or applies a five-year/five-season eligibility model or age-based eligibility limitations, the loss of a season caused by QU's late announcement and the delay required to locate another varsity opportunity may permanently reduce the number of seasons Plaintiffs and recruits can compete in NCAA varsity rugby.

214.   Comparable opportunities are extraordinarily limited. There are approximately thirteen NCAA Division I women's rugby programs nationwide. As a result, Plaintiffs do not have a broad market of comparable Division I women's varsity rugby opportunities available to them.

215.   Those limited opportunities are further constrained because three of the thirteen NCAA Division I women's rugby programs are Ivy League institutions, which do not offer athletic scholarships and have highly selective admissions standards. For many Plaintiffs, those institutions are not substitutes for QU's varsity rugby program because they may not provide comparable admissions access, athletic financial assistance, timing, academic fit, or roster availability.

216.   The elimination of QU women's varsity rugby therefore cannot be remedied by telling Plaintiffs to transfer. QU's decision removes one of a small number of Division I women's rugby opportunities in the country, after many comparable roster, scholarship, admissions, and transfer opportunities have already closed or narrowed, and at a time when NCAA eligibility changes may make delay itself irreparable harm.

217.   Additionally, before QU announced the elimination of the women's varsity rugby program, the QU women's varsity rugby Head Coach Becky Carlson repeatedly and publicly

raised concerns regarding QU's treatment of female athletes and women's athletic programs, including in statements to the press.

218.   Coach Carlson's public advocacy included concerns regarding QU's treatment of women's athletics, the University's support for women's teams, and the treatment and recognition afforded to the women's rugby program.

219.   Coach Carlson also publicly addressed concerns regarding the treatment of female coaches and the circumstances surrounding decisions affecting women's athletic programs at QU.

220.   Between 2013 and 2016, Coach Carlson repeatedly complained that QU was not providing the women's varsity rugby team with equal, or even adequate, practice facilities. She complained that QU provided all its men's varsity teams with regulation, well-maintained practice facilities but it did not do so for the women's varsity rugby team. She also complained that due in part to QU's failure to provide equal benefits and treatment to the women's rugby team, it was not fulfilling its obligations under the 2013 Consent Decree to promote women's rugby as a varsity sport.

221.   In 2017, Coach Carlson filed a formal complaint with the Office of Civil Rights against QU for failing to provide equal treatment and benefits to its male and female student athletes for things such as strength and conditioning training programs, facilities, and publicity. Coach Carlson also complained that employees of the athletic department and administration made discriminatory and inappropriate remarks. These remarks included failing to publicize the women's rugby team's national championship wins and informing the female athletes that the men's ice hockey team was more deserving of QU's promotion for media attention. The complaint also detailed sexist remarks that a male coach had made to multiple female student athletes.

222.   In October 2023, Coach Carlson gave an interview detailing a small part of QU's

43

unequal treatment of its men's and women's teams. https://quchronicle.com/83842/featured/three-titles-a-fraction-of-the-recognition-quinnipiac-rugby-national-championships/.

223.    Coach Carlson's public advocacy concerned sex-based inequities in QU's athletic programs and constituted protected Title IX-related activity.

224.    Upon information and belief, Coach Carlson also made numerous internal complaints to QU regarding Title IX concerns throughout her time as a head coach, including the 2025-26 academic year.

225.    QU administrators and athletic department leadership were aware of Coach Carlson's public Title IX-related advocacy before QU announced the elimination of the women's varsity rugby program.

226.    Rather than remedy the unequal treatment and benefits provided to female student athletes, QU chose to eliminate the women's varsity rugby program.

227.    QU's decision followed protected Title IX advocacy regarding QU's treatment of female athletes and was materially adverse to Plaintiffs and other female student athletes.

228.    The elimination of women's varsity rugby strips Plaintiffs and other team members of the benefits, treatment, services, support, institutional recognition, training, coaching, competition, facilities access, travel opportunities, recruiting benefits, and team membership associated with Division I varsity athletics.

229.    QU's decision injured Plaintiffs and other female student athletes whose rights Coach Carlson's Title IX advocacy sought to protect.

230.    QU's decision also sends a message to female student athletes, witnesses, coaches, and others that raising or supporting Title IX concerns may result in adverse consequences, including the loss of athletic opportunities, team support, and varsity status.

44

231.    QU's retaliatory elimination of the women's varsity rugby program would deter a reasonable student-athlete, witness, coach, or other person from raising, supporting, participating in, or pursuing Title IX concerns or complaints regarding QU's treatment of female athletes.

232.    QU's conduct has chilled and will continue to chill Plaintiffs, proposed class members, witnesses, and other students from raising, supporting, participating in, or pursuing Title IX complaints or this litigation.

233.    QU had alternatives to eliminating the women's varsity rugby program, including addressing unequal treatment and benefits, reallocating resources equitably, and engaging in a transparent process with affected student athletes and stakeholders.

234.    Instead, QU chose to eliminate the women's varsity rugby program, the team whose coach had publicly raised Title IX-related concerns regarding QU's treatment of female athletes.

235.    QU's decision to eliminate, defund, downgrade, or discontinue the women's varsity rugby program constitutes retaliation in violation of Title IX.

236.    QU's obligation to provide female student athletes equal athletic benefits, treatment, services, resources, and support applies to all athletic benefits and resources administered through its intercollegiate athletics program, including any new or expanded benefits made available as a result of changes to the NCAA athletics model, such as revenue-sharing payments, NIL-related support, direct student-athlete payments, or other benefits arising from the House v. NCAA settlement, approved in In re College Athlete NIL Litigation, 803 F. Supp. 3d 959 (N.D. Cal. 2025).

237.    Upon information and belief, QU has opted into or is participating in the post-House settlement NCAA framework that permits schools to provide revenue-sharing payments, NIL-related support, direct financial benefits, or other new athletic benefits to student athletes.

238.    To the extent QU provides revenue-sharing payments, NIL-related support, direct financial benefits, or other new athletic benefits to student athletes, Title IX requires QU to provide those benefits without sex discrimination and in a manner that does not deny female student athletes equal athletic benefits, treatment, services, resources, or support.

239.    QU's own announcement described the elimination of women's varsity rugby as part of a strategic athletics realignment involving long-term competitive priorities, fiscal sustainability, department resources, resource allocation, gender equity considerations, and the evolving Division I athletics landscape. https://gobobcats.com/news/2026/4/14/general-quinnipiac-university-announces-athletics-realignment-to-support-long-term-competitive-financial-and-title-ix-objectives.

240.    QU may not use the implementation of revenue sharing or other new athletic financial benefits as a basis to reduce, eliminate, or retaliate against women's varsity teams or female student athletes.

241.    In that same announcement, QU stated that it would add a men's indoor and outdoor distance program to expand men's participation opportunities while transitioning women's rugby from varsity to club status and redirecting varsity-level resources to other programs.

242.    QU is not administering, allocating, or making available post-*House* athletic benefits, resources, opportunities, and support on an equal basis to male and female student athletes. Instead, QU has preserved, enhanced, prioritized, or protected access to certain athletic benefits, resources, opportunities, and institutional support for male student athletes or men's athletic programs while reducing, eliminating, or restricting comparable opportunities available to female student athletes.

243.    QU's decision to eliminate women's varsity rugby formed part of that unequal

46

allocation of athletic resources and opportunities. By removing women's rugby from varsity status while preserving and expanding men's participation opportunities, Defendants denied female student athletes equal access to the varsity platform through which post-*House* athletic benefits, opportunities, visibility, support, and resources are administered.

244.    QU's stated budgetary, resource-allocation, roster-management, and strategic rationales do not excuse its obligations. To the extent QU is implementing post-*House* athletics restructuring, it must do so without reducing, eliminating, retaliating against, or disproportionately burdening women's varsity teams or female student athletes.

245.    Additionally, QU's Equity in Athletics Disclosure Act ("EADA") data reflect persistent disparities in the resources provided to female student athletes as compared to male student athletes.

246.    From 2020–21 through 2024–25—the year for which the most recent data is available—QU provided more resources to men's teams than to women's teams, even though QU sponsors more women's teams than men's teams.

247.    In 2020–2021, female student athletes made up approximately 62.56% of QU's unduplicated student athletes, but QU spent only approximately 52.80% of its recruiting expenses on female student athletes.

248.    In 2021–2022, female student athletes made up approximately 63.08% of QU's unduplicated student athletes, but QU spent only approximately 58.53% of its recruiting expenses on female student athletes.

249.    In 2022–23, female student athletes made up approximately 64.27% of QU's unduplicated student athletes, but QU spent only approximately 56.67% of its recruiting expenses on female student athletes.

250.    In 2024–25, female student athletes made up approximately 63.45% of QU's unduplicated student athletes, but QU spent only approximately 56.76% of its recruiting expenses on female student athletes.

251.    QU also spent less in recruiting expenses per female student-athlete than per male student-athlete in every available year from 2020–21 through 2024–25.

252.    In 2024–25, QU spent approximately $862.21 in recruiting expenses per male student-athlete, compared to approximately $652.09 per female student-athlete.

253.    QU's team expense data also reflect disparities in the resources provided to female student athletes. In each year from 2020–21 through 2024–25, the percentage of athletic expenses spent on women's teams was lower than the percentage of QU student athletes who were female.

254.    In 2020–21, female student athletes made up approximately 62.56% of QU's unduplicated student athletes, but women's teams received approximately 51.19% of allocated athletic team expenses. QU spent approximately $54,108 in athletic expenses per male student-athlete, compared to approximately $47,488 per female student-athlete, a difference of approximately $6,619 per female student-athlete.

255.    In 2021–22, female student athletes made up approximately 63.08% of QU's unduplicated student athletes, but women's teams received approximately 51.38% of allocated athletic team expenses. QU spent approximately $54,660 in athletic expenses per male student-athlete, compared to approximately $49,979 per female student-athlete, a difference of approximately $4,680 per female student-athlete.

256.    In 2022–23, female student athletes made up approximately 64.27% of QU's unduplicated student athletes, but women's teams received approximately 49.81% of allocated athletic team expenses. QU spent approximately $61,196 in athletic expenses per male student-

athlete, compared to approximately $50,481 per female student-athlete, a difference of approximately $10,715 per female student-athlete.

257.    In 2023–24, female student athletes made up approximately 63.16% of QU's unduplicated student athletes, but women's teams received approximately 49.43% of allocated athletic team expenses. QU spent approximately $58,872 in athletic expenses per male student-athlete, compared to approximately $52,232 per female student-athlete, a difference of approximately $6,639 per female student-athlete.

258.    In 2024–25, female student athletes made up approximately 63.45% of QU's unduplicated student athletes, but women's teams received approximately 49.65% of allocated athletic team expenses. QU spent approximately $60,337 in athletic expenses per male student-athlete, compared to approximately $52,503 per female student-athlete, a difference of approximately $7,833 per female student-athlete.

259.    QU's EADA data also show disparities even when looking at spending between men's teams and women's teams in the same sport. For example, in 2024–25, women's basketball received approximately $279,138 less than men's basketball, women's ice hockey received approximately $857,214 less than men's ice hockey, softball received approximately $87,226 less than baseball, and women's lacrosse received approximately $406,799 less than men's lacrosse.

260.    QU's decision to eliminate women's varsity rugby must be understood against this broader background of unequal treatment and benefits. Rather than remedy disparities in the benefits, treatment, services, resources, and support provided to female student athletes, QU chose to eliminate one of its nationally recognized women's varsity programs after Title IX concerns were raised regarding its treatment of female athletes.

## INJUNCTIVE RELIEF

261.    Plaintiffs are entitled to immediate injunctive relief restraining QU from continuing

to retaliate and discriminate on the basis of sex, restraining QU from eliminating, downgrading, defunding, or otherwise discontinuing the women's varsity rugby program and prohibiting QU from retaliating against Plaintiffs, class members, witnesses, and others for protected Title IX activity.

262.    Failure to grant the requested immediate injunctive relief will cause immediate and irreparable harm to Plaintiffs and to present and future female student athletes at QU by permitting Defendants' discriminatory and retaliatory conduct to continue.

263.    If QU is permitted to eliminate women's varsity rugby, Plaintiffs will permanently lose the opportunity to compete in a nationally elite Division I athletic program and the unique educational experience associated with it. Participation in varsity athletics provides substantial academic, athletic, professional, physical, psychological, social, and economic benefits that extend far beyond a student-athlete's collegiate career and cannot be adequately replaced through monetary damages or other legal remedies. Plaintiffs and class members will also suffer irreparable harm from the chilling effect caused by QU's retaliation, which deters female student athletes, witnesses, and others from raising, supporting, participating in, or pursuing Title IX concerns or complaints. Accordingly, there is no adequate remedy at law for the harm Plaintiffs will suffer absent injunctive relief.

264.    The continuing and irreparable harm inflicted on Plaintiffs by Defendants' discriminatory and retaliatory actions overwhelmingly outweighs any burden associated with preserving the women's varsity rugby program. Absent injunctive relief, Plaintiffs will immediately lose irreplaceable athletic, educational, professional, and personal-development opportunities that cannot meaningfully be recreated or recovered elsewhere.

265.    The timing of Defendants' decision to eliminate the women's rugby team only

magnifies this harm. Defendants announced the elimination of the program at a point in the recruiting, transfer, and admissions cycle when roster spots, scholarship opportunities, and enrollment decisions at comparable Division I programs across the country had already largely been finalized. As a result, current student athletes, incoming recruits, and prospective student athletes who committed to QU based in substantial part on the existence of its nationally elite women's rugby program have little to no realistic opportunity to secure equivalent athletic and educational opportunities elsewhere on such short notice. By contrast, requiring Defendants to maintain a varsity program that QU has funded, promoted, and celebrated for years and to refrain from retaliation merely preserves the status quo pending final resolution of this action.

266.    Immediate injunctive relief is necessary because these harms cannot be fully remedied after final judgment. Plaintiffs will lose current roster positions, training cycles, competition opportunities, recruiting value, team membership, coaching relationships, NIL-related exposure, post-*House* economic opportunities, Olympic-related pathways, and varsity benefits that depend on continued varsity status. For certain Plaintiffs and incoming recruits, those harms are compounded by the evolving NCAA eligibility landscape, including proposed age-based eligibility restrictions and other reforms that may limit the time available to compete at the Division I level. Lost eligibility opportunities and competitive seasons cannot be restored after final judgment.

267.    Plaintiffs seek emergency relief to preserve the women's varsity rugby program that Defendants had already operated, funded, promoted, and relied upon as part of its Title IX compliance while this Court determines whether Defendants' conduct violates federal law.

268.    Defendants will benefit not only from compliance with federal law, but also from the substantial educational, reputational, and enrollment advantages that flow from preserving and

supporting a nationally successful women's athletic program. Maintaining an elite women's rugby program and providing equal athletic benefits, treatment, services, resources, and support for female student athletes enhances QU's reputation, fosters alumni and community support, strengthens recruitment and retention efforts, and demonstrates a meaningful commitment to the principles underlying Title IX.

269.    The injunctive relief requested by Plaintiffs serves the public interest because it preserves and protects equal educational and athletic benefits for female student athletes, promotes compliance with federal law, and prevents retaliation for protected Title IX activity. Congress expressly recognized the strong public interest in eliminating sex-based discrimination in education when it enacted Title IX, and the enforcement of those protections remains a matter of substantial public importance. Ensuring that female student athletes receive equal athletic benefits and treatment and may raise or support Title IX concerns without retaliation serves the public interest and strongly supports the injunctive relief requested in this action.

## COUNT I
## TITLE IX
### Retaliation

270.    Plaintiffs re-allege and incorporate by reference all the foregoing allegations.

271.    The Plaintiffs bring this claim as a class action as set forth under the Class Allegations.

272.    Title IX and its implementing regulations prohibit retaliation for complaints of sex discrimination. 20 U.S.C. §1681; 34 C.F.R. § 106.71; *Jackson,* 544 U.S. at 174, 178, 183. Such retaliation includes "intimidat[ing], threaten[ing], coerc[ing], or discriminat[ing] against any individual for the purpose of interfering with any right or privilege secured by title IX." 34 C.F.R. § 106.71.

273.    Protected Title IX activity includes raising concerns about sex discrimination, unequal treatment, unequal benefits, unequal support, or other inequities affecting female students, female student athletes, female coaches, or women's athletic programs.

274.    Before QU announced the elimination of the women's varsity rugby program, Head Coach Becky Carlson publicly spoke out regarding QU's treatment of female coaches, female athletes, and women's athletic programs. Upon information and belief, Coach Carlson also raised these concerns privately with QU administrators and athletic department leadership.

275.    Coach Carlson's public advocacy concerned sex-based inequities in QU's athletics program and constituted protected Title IX-related activity.

276.    Upon information and belief, QU administrators and athletic department leadership were aware of Coach Carlson's public statements and Title IX-related advocacy before QU announced the elimination of the women's varsity rugby program.

277.    QU thereafter announced that it would eliminate, defund, downgrade, discontinue, or otherwise cease supporting the women's varsity rugby program.

278.    QU's decision to eliminate the women's varsity rugby program was materially adverse to Plaintiffs and other female student athletes because it deprived them of the benefits, treatment, services, support, institutional recognition, training, coaching, competition, facilities access, travel opportunities, recruiting benefits, and team membership associated with Division I varsity athletics.

279.    QU's retaliatory decision occurred as Defendants were implementing or preparing to implement the post-*House* athletics model arising from the settlement, approved in *In re College Athlete NIL Litigation*, 803 F. Supp. 3d 959 (N.D. Cal. 2025), including new or expanded revenue-

sharing, NIL-related financial payments, roster-management, financial, promotional, recruiting, and institutional-support decisions affecting student athletes.

280. Defendants may not use *House*-related implementation, revenue-sharing obligations, NIL restructuring, roster management, budgetary reallocations, fiscal sustainability, or other athletics restructuring as a pretext or mechanism to retaliate against female student athletes, coaches, witnesses, or women's teams associated with protected Title IX advocacy.

281. Defendants selected women's varsity rugby for elimination while preserving and expanding men's varsity athletic opportunities. By imposing the burden of athletics restructuring on the women's program most closely associated with protected Title IX advocacy, Defendants engaged in conduct that would deter a reasonable person from raising or supporting Title IX concerns.

282. The use of budgetary, roster-management, fiscal-sustainability, NIL-related expenses, revenue-sharing, or post-*House* restructuring rationales to eliminate the very women's program associated with protected Title IX advocacy would amplify the retaliatory effect of Defendants' decision by signaling to female student athletes, coaches, witnesses, and supporters that raising Title IX concerns may result in the loss of varsity status, elimination of an entire varsity program, team resources, economic opportunities, and institutional support.

283. QU's decision injured Plaintiffs and other female student athletes whose rights Coach Carlson's advocacy sought to protect.

284. QU's decision would deter a reasonable student-athlete, witness, coach, or other person from raising, supporting, participating in, or pursuing Title IX concerns or complaints regarding QU's treatment of female athletes.

285.    QU's conduct has chilled and will continue to chill Plaintiffs, members of the proposed class, witnesses, and other students from raising, supporting, participating in, or pursuing Title IX complaints or this litigation.

286.    QU's elimination, defunding, downgrading, discontinuation, or withdrawal of support from women's varsity rugby constitutes retaliation in violation of Title IX.

287.    Plaintiffs are entitled to declaratory, preliminary injunctive, permanent injunctive, and other appropriate relief.

**COUNT II**
**Title IX**
**Unequal Allocation of Athletic Treatment and Benefits**

288.    Plaintiffs re-allege and incorporate herein by this reference all the foregoing paragraphs of this complaint.

289.    The Plaintiffs bring this claim as a class action as set forth under the Class Allegations.

290.    QU provides its varsity student athletes with certain benefits, including but not limited to, equipment, supplies, uniforms, locker rooms, scheduling for competitions, transportation and accommodations for travel, per diem for travel, coaching, tutoring and academic support services, practice and competition facilities, medical and training services, weight training and conditioning services, housing and dining services, sports information and publicity services, recruiting, video support, and other services.

291.    Under Title IX and 34 C.F.R. §106.41(c), QU must allocate these benefits equally between male athletes and female athletes. On a program-wide basis, it must provide female athletes with benefits that are comparable to those that it provides to male athletes.

292.    Defendants allocate athletic benefits, resources, support, budgets, and opportunities in a manner that disproportionately favors male student athletes and fails to provide female student

athletes with benefits and treatment equivalent to those required by Title IX.

293.   Defendants have opted into and are participating in the post-House NCAA framework and are providing, administering, facilitating, supporting, or preparing to provide new athletic benefits to student athletes, including revenue-sharing payments, NIL-related support, direct student-athlete payments, roster-related financial benefits, promotional support, athlete-branding support, recruiting resources, donor-funded opportunities, collective-related opportunities, institutional visibility, and related athletic resources. Defendants must administer those benefits on an equal basis and without sex discrimination.

294.   QU has failed to increase or provide sufficient benefits (or the resources and budgets necessary to purchase the benefits) to its women's varsity athletic teams despite requiring that they carry significantly more athletes. Meanwhile, QU has not decreased the benefits that it provides to men's varsity athletic teams even though they now carry significantly fewer athletes. As a result, while each male athlete now receives more or better benefits, each female athlete now receives fewer or worse benefits than in prior years.

295.   Defendants fail to provide equal athletic benefits in some or all the categories set forth in the Regulations and the Policy Interpretation, including but not limited to:

1. The provision of equipment, uniforms, and supplies;
2. Scheduling of games and practice time;
3. Travel, transportation, and per-diem allowance;
4. Opportunity to receive coaching and academic tutoring;
5. Assignment and compensation of coaches and tutors;
6. Provision of locker rooms, practice, and competitive facilities;
7. Provision of medical and training services;
8. Provision of housing and dining facilities and services;
9. Publicity & sports information services;
10. Administrative support;
11. Recruiting resources and support; and
12. Resources necessary to provide any of the foregoing benefits or to provide the female athletes with a genuine Division I athletic experience.

296.    Plaintiffs are harmed by Defendants' failure to provide its female student athletes with an equal allocation of benefits and resources. Such harm includes lost educational opportunities, lost competitive advantage, and less quality in participation opportunities. Accordingly, they are entitled to the relief requested herein.

**COUNT III**
**Title IX**
**Sex Discrimination**

297.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

298.    Plaintiffs bring this claim as a class action as set forth in the Class Allegations.

299.    Title IX prohibits recipients of federal financial assistance from excluding any person from participation in, denying any person the benefits of, or subjecting any person to discrimination under any education program or activity on the basis of sex. 20 U.S.C. § 1681(a).

300.    QU is aware of its obligations under Title IX as they previously were tried, found liable, enjoined, and required to reform the athletics program after a federal court determined that they failed to provide female students equal athletic participation opportunities. *See Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62 (D. Conn. 2010), *aff'd*, 691 F.3d 85 (2d Cir. 2012).

301.    Defendants relied on women's varsity rugby as part of their post-*Biediger* compliance posture. In moving to lift the prior injunction, Defendants represented that Quinnipiac had added women's varsity rugby as a varsity team. *See Biediger v. Quinnipiac Univ.*, No. 3:09-cv-00621, ECF No. 225-1, at 2 (Dec. 22, 2011) (Def. Mot. to Lift Injunction).

302.    Having used women's varsity rugby as part of their resolution to prior Title IX liability, Defendants cannot now characterize the elimination, defunding, downgrading, or withdrawal of support from that same program as a neutral administrative decision.

57

303. Defendants chose to eliminate women's varsity rugby rather than remedy the unequal treatment, unequal benefits, and unequal institutional support provided to female student athletes.

304. Defendants' violations are not limited to the elimination of the women's varsity rugby team. Defendants also failed to provide female student athletes equal athletic benefits, treatment, services, opportunities, resources, and support in the areas identified above, including but not limited to facilities, publicity, institutional recognition, athletic training and medical services, strength and conditioning, recruiting support, equipment, scheduling, travel, coaching-related support, and other services and resources associated with Division I varsity athletics.

305. Those unequal treatment and benefits violated the spirit, purpose, and requirements of the 2013 Consent Decree, which required Defendants to provide equal treatment and benefits to their men's and women's varsity athletic programs and to promote women's rugby as a varsity sport.

306. Defendants participated in, approved, ratified, authorized, permitted, or implemented the decision to eliminate, defund, downgrade, discontinue, or otherwise withdraw support from women's varsity rugby despite knowing that the decision would deprive female student athletes of athletic participation opportunities and the benefits, treatment, services, resources, support, and institutional recognition associated with Division I varsity athletics.

307. As alleged above, Defendants have opted into or are participating in the post-*House* NCAA framework and are providing, administering, facilitating, supporting, or preparing to provide new or expanded athletic benefits to student athletes, including revenue-sharing payments, NIL-related support, direct student-athlete payments, promotional support, roster-related financial benefits, recruiting resources, athlete-branding support, institutional visibility, donor-funded

opportunities, collective-related opportunities, and related athletic resources. These new or increased supports are subject to Title IX.

308. Defendants are providing, administering, allocating, or prioritizing those post-*House* advantages unequally. Defendants are providing or preserving greater access to athletic benefits, resources, publicity, financial support, institutional support, NIL-related opportunities, athlete-branding support, roster-related benefits, and other post-*House* opportunities for male student athletes while eliminating women's varsity rugby and denying female student athletes equal access to the varsity platform through which those benefits are delivered.

309. Defendants chose to expand men's athletic participation opportunities while transitioning women's rugby from varsity to club status. Defendants identified the addition of men's distance track as a "high impact opportunity" that would "expand men's participation efficiently," while describing the elimination of women's varsity rugby as a means of redirecting "varsity level resources" to other programs.

310. Defendants' claimed budgetary, resource-allocation, roster-management, and strategic rationales do not excuse their Title IX violations. They confirm Defendants' choice to remove female student athletes from varsity status, strip them of varsity-level benefits, and redirect varsity resources elsewhere while adding or expanding men's participation opportunities.

311. Title IX does not permit Quinnipiac to achieve post-*House* athletics restructuring by imposing the burden of those choices on female student athletes.

312. Defendants' *House*-related decisions, implementation, revenue-sharing obligations, NIL restructuring, roster management, budgetary reallocations, and other athletics restructuring were used to eliminate, reduce, downgrade, and disproportionately burden women's varsity rugby while preserving, enhancing, protecting, or prioritizing comparable opportunities,

59

benefits, resources, publicity, financial support, and institutional support for male student athletes. Defendants thereby discriminated against Plaintiffs and other female student athletes on the basis of sex.

313.    Defendants' use of the post-*House* landscape to justify, mask, or implement cuts to women's athletic opportunities and benefits is particularly egregious because *House*-related benefits expand the universe of athletic resources that must be administered equitably. By eliminating women's varsity rugby, Defendants denied Plaintiffs and other female student athletes equal access to both traditional varsity benefits and post-*House* benefits, including increased visibility, publicity, branding opportunities, NIL-related support, revenue-sharing opportunities where available, donor and sponsorship exposure, media attention, recruiting value, athlete-branding support, and institutional investment that accompany varsity status in the modern college athletics model.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Enter an emergency order restraining Defendants from eliminating, downgrading, defunding, discontinuing, or otherwise harming the women's varsity rugby program or any other women's varsity team;

B.    Enter an order declaring that Defendants have engaged in and continue to engage in discrimination against female student athletes on the basis of sex in the operation of QU's intercollegiate athletics program, in violation of Title IX and its implementing regulations;

C.    Certify this action as a class action on behalf of all present and future female students at QU who participate in, seek to participate in, or are affected by QU's intercollegiate athletics program and who are harmed by QU's unequal provision of athletic benefits, treatment, services, resources, and support, or by QU's retaliation for protected Title IX activity;

D.      Issue permanent injunctive relief requiring Defendants to provide female student athletes and women's varsity teams with equal athletic benefits, treatment, services, resources, and support, including but not limited to equal treatment in coaching, training, facilities, equipment, scheduling, travel, medical and athletic training services, strength and conditioning, publicity, recruitment support, competitive opportunities, and related athletic services;

E.      Issue preliminary and permanent injunctive relief prohibiting Defendants from retaliating against Plaintiffs, class members, female student athletes, witnesses, coaches, parents, or others for raising, supporting, participating in, or pursuing Title IX concerns, complaints, or this litigation;

F.      Issue preliminary and permanent injunctive relief prohibiting Defendants from using *House*-related implementation, revenue-sharing obligations, NIL restructuring, roster management, budgetary reallocations, fiscal sustainability, or other athletics restructuring as a pretext or mechanism to eliminate, reduce, downgrade, or disproportionately burden women's varsity teams or female student athletes;

G.      Issue permanent injunctive relief requiring Defendants to administer all post-*House* athletic benefits on an equal basis and without sex discrimination, including but not limited to revenue-sharing payments, NIL-related support, direct student-athlete payments, promotional support, athlete-branding support, roster-related financial benefits, recruiting resources, donor-funded opportunities, collective-related opportunities, institutional visibility, and related athletic resources;

H.      Maintain jurisdiction over this action to monitor Defendants' compliance with this Court's orders;

61

I.    Award the Plaintiffs compensatory damages that are incidental to the equitable relief at hand and permitted under the law;

J.    Award Plaintiffs their reasonable attorneys' fees and expenses; and

K.    Order such other and further relief as the Court deems appropriate.

Dated: June 5, 2026

Respectfully Submitted,

 /s/ Christine D. Brown
**CHRISTINE BROWN & PARTNERS, LLC**
Christine D. Brown
    Federal Bar No. 20790
Ben LaCourse
    *Pro Hac Vice Admission Application Forthcoming*
1700 East Putnam Avenue, Suite 400
Old Greenwich, Connecticut 06870
Telephone: (203) 684-1834
christine@christinebrownsportslaw.com
ben@christinebrownsportslaw.com

**BULLOCK LAW PLLC**
Lori Bullock
    *Pro Hac Vice Admission Application Forthcoming*
309 E 5th St., Suite 202b
Des Moines, IA 50309
Telephone: (515) 423-0551
lbullock@bullocklawpllc.com

*Attorneys for Plaintiffs*