# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

REAGAN PEREZ, CAROLYN )
MELODY, ANASTASIA BYRNE, )
GEORGIA BROWN, REGAN JACKSON, )
MACEY DUNN, BROOKE HARNISCH, )
DELILAH STABERG, MEILIN LEMIS, )
GRACE HINTON, ALEXA )
KIRSCHNER, EMMA PEREZ, )
MORGAN SAYLORS, AVA DECOOPER )    3:26-CV-00898 (KAD)
WRIDE, SAMANTHA AGOSTIN, )
MELANIE SANCHEZ, ANNA WRIGHT, )
LAYLA COX, MCKENZIE KROEGER, )
AVA THAYER, SORYAH HART, )
EMILY HARTMAN, and CASSY )
LEWANDOWSKI, )
*individually and on behalf of all those* )    June 30, 2026
*similarly situated,* )
　　　*Plaintiffs*, )
 )
　　　v. )
 )
QUINNIPIAC UNIVERSITY, )
QUINNIPIAC UNIVERSITY BOARD OF )
TRUSTEES, MARIE HARDIN, and )
GREG AMODIO, )
　　　*Defendants*. )

## MEMORANDUM OF DECISION
### Re: Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
### (ECF No. 2)

Kari A. Dooley, United States District Judge:

　　　In April 2026, Defendant Quinnipiac University ("QU," "Quinnipiac," or the "University")

announced that it would be relegating the women's varsity rugby team to club status.  In response,

Plaintiffs, all current or incoming members of Quinnipiac's women's rugby team, commenced this

action against Quinnipiac; its Athletic Director, Greg Amodio; its President, Marie Hardin; and its

Board of Trustees.[1]  Plaintiffs allege that the demotion of the rugby team constitutes a violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, as both gender discrimination and illegal retaliation for Title IX complaints made by the team's head coach Rebecca Carlson.  Simultaneous to the filing of the Complaint, Plaintiffs filed a motion seeking preliminary injunctive relief, preventing Quinnipiac from relegating the women's varsity rugby team to club status and requiring Quinnipiac to maintain the team as a varsity program during the pendency of this litigation.  *See* Pls.' PI Motion, ECF No. 2.  The Court held an evidentiary hearing on Plaintiffs' motion on June 23–24, 2026.  ECF Nos. 36, 38.  Oral arguments on the motion were held on June 26, 2026.  ECF No. 41.

## I.    Facts and Procedural History

The following facts are drawn from the Complaint, the parties' submissions in connection with the pending motion, the exhibits received at the hearing, and the testimony of the witnesses who appeared on June 23 and 24, 2026.  Where a fact is in dispute, the Court identifies the competing evidence as to the fact.  The Court recounts the evidence to frame the questions presented and does not, at this juncture, resolve disputed questions of fact except as necessary to its analysis.[2]

---

[1] Plaintiffs bring this action as a putative class action on behalf of not only the women's rugby team, but on behalf of all present and future Quinnipiac women student athletes injured by Quinnipiac's alleged non-compliance with Title IX.  For purposes of this decision, the Court need not address the issue of class certification nor injunctive relief as to any student athletes other than the women's rugby team, as Plaintiffs only seek a preliminary injunction as to current and incoming women's rugby student athletes.

[2] To the extent the Court makes any findings of fact, it is important to note that the findings are predicated on a limited record.  For this reason, it is well-established that this decision is not binding on the Court, *Const. State Challenge, Inc. v. Nyemchek*, No. 3:00-CV-650 (CFD), 2001 WL 640417, at *5 n.11 (D. Conn. June 1, 2001) (Droney, J.) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), nor does it constitute law of the case, *Alharbi v. Miller*, 368 F. Supp. 3d 527, 556 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 829 F. App'x 570 (2d Cir. 2020).

The *Biediger* Litigation and the Origins of Women's Varsity Rugby

More than a decade ago, this Court addressed Quinnipiac's obligations to provide its female students equal athletic opportunities after the University moved to eliminate the women's varsity volleyball team and restructure its athletics program. *See Biediger v. Quinnipiac Univ. ("Biediger III")*, 728 F. Supp. 2d 62, 63 (D. Conn. 2010) (Underhill, J.) (decision after bench trial); *Biediger v. Quinnipiac Univ. ("Biediger II")*, 691 F.3d 85, 91–92 (2d Cir. 2012) (affirming district court's grant of preliminary injunction). That litigation resulted in a consent decree entered in 2013 (hereinafter, the "Consent Decree"), under which the University operated its athletics department in defined "tiers" and was required to submit periodic reports concerning the status, funding, and composition of its athletic program. Quinnipiac created the women's varsity rugby program after the *Biediger* litigation in an effort to comply with Title IX and expand athletic opportunities for women. After the Consent Decree expired in June 2024, the University's "tiering" of programs became less rigid and more informal. Plaintiffs emphasize that the University now seeks to eliminate the very women's varsity program that it added to achieve Title IX compliance.

The women's varsity rugby team competes in the National Intercollegiate Rugby Association (NIRA). It won national championships in 2015, 2016, and 2017. The program also produced Olympian Ilona Maher. Because of these accomplishments, Plaintiffs assert that the program remains highly regarded in the women's rugby community. The National Collegiate Athletic Association (NCAA) categorizes women's rugby as an "emerging sport," meaning that Quinnipiac may count the team toward its varsity participation figures for purposes of Title IX. Women's rugby has remained an emerging sport for more than two decades without attaining full

NCAA championship sport status.  There are only thirteen Division I varsity women's rugby programs nationwide.

Coach Carlson and Her Title IX Advocacy

Rebecca Carlson served as the head coach of Quinnipiac women's varsity rugby from 2010 until the program's demotion to club status in 2026—that is, for the entirety of the program's existence.  Plaintiffs allege, and Carlson testified, that throughout her tenure she repeatedly raised concerns that the University treated women's programs, female coaches, and female student athletes unequally.  According to Plaintiffs, between 2013 and 2025, Carlson raised such concerns annually regarding resources, institutional support, facilities, administrative treatment, and the University's broader athletics priorities.  She shared those concerns with the players on her team, raised concerns through annual evaluations and assessments, and made a number of her complaints public through the press and online media.  The record further reflects that Carlson filed formal complaints with the U.S. Department of Education's Office for Civil Rights (hereinafter, "OCR") in 2017 and 2018, in which she alleged unlawful retaliation and gender discrimination in violation of Title IX.

Greg Amodio, Quinnipiac's Athletic Director since 2015, testified that Carlson was a fierce advocate for her program.  And although Carlson complained over the years about the athletic facilities, the rugby pitch, seating, the lack of enclosures, and similar concerns, Amodio testified that many of these concerns were addressed by Quinnipiac.  He further testified that he viewed her complaints as advocacy for her team and not, as alleged, Title IX specific complaints.  While he was aware that Carlson had very publicly[3] complained about the disparate publicity afforded to

---

[3] For instance, Carlson gave an interview to the Quinnipiac Chronicle in 2023 following the national championship for QU's men's ice hockey team in which she described the disparate publicity and response between the 2023 celebration for the men's hockey team and the comparatively muted response to the women's rugby team's NIRA national championships.

4

the women's rugby team as compared with the men's ice hockey team, following their respective national championships, he did not interpret this complaint as a Title IX complaint. Notably, Amodio testified that Carlson's history of complaints did not factor into the decision to eliminate women's rugby as a varsity sport. Plaintiffs allege otherwise.

In September 2023, Carlson submitted a letter of resignation to her direct report Sarah Fraser, an Associate Athletic Director. The envelope directed Fraser not to open the envelope until July 1, 2024. Carlson testified that, at the time, she was unhappy with how she was treated by Quinnipiac as well as her colleagues, and that she believed the rugby program could transition into the hands of her assistant coach and mentee. In July 2024, after opening the resignation letter, Fraser challenged whether Carlson truly wanted to resign; Carlson agreed that she did not, and Fraser thereafter did not accept Carlson's resignation letter. Carlson stayed at Quinnipiac for the 2024–2025 academic year, and thereafter for the 2025–2026 academic year.

The NCAA and *House* Settlement

In 2020, a class of current and former Division 1 student athletes brought an antitrust class action against the NCAA in the Northern District of California, alleging that NCAA rules restricting student athlete compensation violated federal antitrust laws. *See In re Coll. Athlete NIL Litig.*, 803 F. Supp. 3d 959, 969 (N.D. Cal. 2025). In 2025, Plaintiffs and the NCAA settled, and Judge Claudia Wilken approved the final settlement on June 6, 2025. *See id.* (hereinafter, the "*House* Settlement"). Quinnipiac chose to opt into the *House* Settlement.[4]

---

[4] Plaintiffs' expert witness, Professor Barbara Osborne, was the expert retained by the NCAA in the *House* litigation. Professor Osborne testified about the scope and terms of the *House* Settlement and both its anticipated and current effects on school athletic programs who have opted into it. The Court relies on her testimony in analyzing the impact of *House* on Quinnipiac and its Title IX compliance, and the Court otherwise takes judicial notice of Judge Wilken's decision granting final approval of the *House* Settlement. *See generally In re Coll. Athlete NIL Litig.*, 803 F. Supp. 3d 959 (N.D. Cal. 2025).

The *House* Settlement provides two sources of student athlete compensation: revenue sharing and Name, Image, and Likeness (NIL) compensation.  Under the revenue sharing provision, schools may share up to a total of $20.5 million, for the 2025–2026 school year, with their student athletes.  That revenue sharing cap is due to increase by 4% each year, and under revenue sharing agreements, schools enter into direct contracts with their student athletes.  Under the NIL provision, student athletes may also enter into deals with third parties, to receive compensation for autographs, promotional arrangements, and appearances.  These deals do not typically involve the school as a party, but Quinnipiac has chosen to help facilitate these deals through a marketplace called "Open Doors."  Of note, the *House* Settlement also allows schools to offer additional scholarships to student athletes.

Quinnipiac's Athletic Director, Greg Amodio, testified that since opting into the *House* Settlement a year ago, they have engaged in revenue-sharing agreements with approximately 10 student athletes for the 2025–2026 academic year.  He also testified that that number has increased to around 30 student athletes for the 2026–2027 academic year.  Amodio denied that any of the money saved from eliminating women's rugby would go to revenue sharing payouts.  However, Plaintiffs' expert witness, Professor Barbara Osborne, explained that the feeling in the sports law community is that the financial model of the *House* Settlement is already becoming unsustainable, and that the longer the settlement framework goes on, schools increasingly risk violating Title IX.

Quinnipiac's Athletics Portfolio Realignment

The *Biediger* Consent Decree expired at the end of June 2024.  In 2025, the outgoing President of the University directed all departments, to include the Athletics Department, to reduce their budgets by 6%.  The proposed reduction was a consequence of an enrollment shortfall in the prior academic year of about 200 undergraduate students, resulting in a reduction of tuition

revenue. By Fall 2025, in addition to exploring ways to achieve the 6% budget reduction, Quinnipiac was also exploring means by which it could meet the substantial proportionality requirements of Title IX. At the time, athletic opportunities for student athletes disproportionately favored women when compared to the overall QU student body.

To achieve the 6% reduction, the Athletics Department developed a series of financial models. *See* Defs.' Ex. 502. The department calculated the savings from a 6% cut for all operational[5] costs across all athletic programs. This reduction produced only an approximate 2% reduction in the Athletic Department's total budget. The department also assessed the impact of more aggressive cuts to staffing and benefits. This approach would have resulted in the elimination of numerous assistant coaching positions in several sports and a reduction in remaining coaches' salaries.[6] The decision was made that such reductions were not acceptable because such reductions would significantly impact competitiveness, recruiting, and the success of the teams impacted. Amodio testified that several different models were explored and rejected. Eventually, in the Spring of 2026, Quinnipiac settled on budget reductions that transitioned women's rugby from varsity to club status. In addition, in order to achieve substantial proportionality under Title IX, Quinnipiac added men's indoor and outdoor track, which it believed could be accomplished by tapping into the existing men's cross-country team, without significant added expense.

Amodio testified that reducing his or other Athletic Department administrators' salaries was not considered. Nor was there any discussion about the elimination or demotion of any team other than women's rugby. Amodio testified that women's rugby was selected, in part, because it

---

[5] Operational costs include items such as equipment, travel, and similar expenses. Operational costs do not include staff salaries or benefits.

[6] Defendants' Exhibit 502 reveals that five salaries would be reduced across three sports programs and that there would need to be as many as 13 full-time and part-time staff layoffs across 13 teams.

remains an "emerging sport" in the NCAA, and the only other program that had been classified as an "emerging sport," Acrobatics and Tumbling, had been elevated to championship sports status by the NCAA in 2026. Amodio also testified that he was aware that women's rugby enjoyed a thriving club scene through National Collegiate Rugby (NCR), which includes 650 club teams with regional leagues, competitions, and post-season play. The elimination of the operational costs, coaching staff, and the nine scholarships associated with the women's rugby team would achieve the required 6% reduction.[7]

On April 14, 2026, Quinnipiac announced that it would discontinue women's varsity rugby at the conclusion of the 2025–2026 academic year, transitioning the program from varsity to club status. *See* Pls.' Ex. 1. The University described the decision as part of a broader athletics "strategic realignment," citing long-term competitive priorities, fiscal sustainability, department resources, resource allocation, gender-equity considerations, and the evolving Division I athletics landscape. In the same announcement, the University stated that it would add a men's indoor and outdoor distance program to expand men's participation opportunities. The announcement was issued approximately two weeks before the end of classes and final examinations.[8]

As a club team, women's rugby would no longer be funded within the Athletics Department; instead, the team would be overseen by Student Affairs. However, Quinnipiac did commit to provide $10,000 toward the expense of a coach for the club team, and approximately $50,000 raised by the rugby team through fundraising will transition to the club team budget. Club

---

[7] Quinnipiac has committed to continue all existing athletic scholarships for the rugby team. As such, the 6% reduction will not be immediately realized but will over time. Quinnipiac permitted the Athletic Department this dispensation on the budget reduction plan.

[8] Named Plaintiffs Carolyn Melody and Reagan Perez are current QU women's rugby student athletes. Both Melody and Perez testified compellingly about the emotional and mental impact that the demotion of the rugby team had on both them and their teammates. Further, they testified that although QU has promised to honor their athletic scholarships, *see supra* at n.7, they have struggled to find another school with a varsity rugby program which would meet their financial and/or academic needs.

teams are generally student-run programs. Student athletes on club teams do not have the same access to training facilities, trainers, and other benefits provided to varsity athletes.

## II.    Standard of Review

"Issuance of preliminary injunctive relief, such as a TRO or preliminary injunction, is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472, 474 (D. Conn. 2007) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005)). "When considering whether to issue a temporary restraining order, the court employs the same standard used to review a request for a preliminary injunction." *Baltas v. Maiga*, No. 3:20-CV-1177 (MPS), 2020 WL 6275224, at *20 (D. Conn. Oct. 26, 2020). This standard requires the moving party to "establish '(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction.'" *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183–84 (2d Cir. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009)).

A district court has wide discretion in determining whether to grant preliminary injunctive relief. *See Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 (2d Cir. 2005) (Sotomayor, J.). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *J.S.R. ex rel. J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) (internal citations omitted). Furthermore, a "mandatory preliminary injunction that alters the status quo by commanding some positive act" has a greater burden of proof than a "prohibitory injunction seeking only to maintain the status quo." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (internal quotation marks and citation omitted).

9

The Court agrees with Plaintiffs that the relief they seek is not a mandatory injunction insofar as they seek to maintain the status quo as it was before the April 14, 2026 announcement.  *See Biediger v. Quinnipiac Univ. ("Biediger I")*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009). Defendants do not argue otherwise.

### III.    Discussion

In Count 1, Plaintiffs assert a claim of retaliation under Title IX on the theory that the women's rugby team was demoted in retaliation for Coach Carlson's Title IX complaints and public advocacy for her team.  And in Counts 2 and 3, they assert sex discrimination claims under Title IX with regards to their unequal treatment and benefits, including their finances, facilities, equipment, scheduling, and other resources.  They also seek to certify a class of all present and future female students at Quinnipiac who participate in or seek to participate in Quinnipiac's athletics program.  However, for the purposes of the Motion, Plaintiffs are only asserting claims on their own behalf, such that the proposed injunction would only enjoin the Defendants from demoting the women's rugby team to a club team.

Although Plaintiffs' motion addresses both discrimination and retaliation claims, at oral argument, Plaintiffs relied exclusively on the retaliation claim and the evidence offered in support of the retaliation claim.  Specifically, Plaintiffs argued that Quinnipiac's decision to demote the women's rugby team was retaliation for Coach Carlson's years-long Title IX complaints and advocacy, and that the budgetary and Title IX rebalancing reasons they proffered for demoting the team were pretextual.[9]  The Court therefore only addresses Plaintiffs' retaliation claim below.

---

[9] As it relates to the discrimination claim, Plaintiffs conceded at oral argument that if QU's roster projections for the 2026–2027 year (with the women's rugby team cut) play out the way that QU expects, then QU's athletic rosters will have achieved substantial proportionality with QU's undergraduate population, thus complying with Title IX.

10

Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681(a). "[P]rogram or activity" includes "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." 20 U.S.C. § 1687(2)(A). Title IX does not expressly provide for a private right of action, but it is nevertheless well settled that Title IX includes an implied private right of action. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979).

The Code of Federal Regulations makes clear that interscholastic student athletics are included under Title IX's "program or activity," and those regulations require covered universities that offer varsity athletics to provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c); *see Biediger I*, 616 F. Supp. 2d at 293. These regulations set forth ten non-exhaustive factors to consider in deciding whether equal opportunities are available to student athletes of both sexes:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

34 C.F.R. § 106.41(c). "A Policy Interpretation, issued by OCR in 1979 (the 'OCR Policy Interpretation'), delineates three areas of regulatory compliance: (1) equal athletic *financial assistance*; (2) equal *treatment and benefits* for athletic teams; and (3) effective accommodation

11

of student *interests and abilities*." *Biediger I*, 616 F. Supp. 2d at 294 (emphases added). A covered university must comply with all three areas to comply with Title IX.

The OCR Policy Interpretation also "provides three ways—commonly referred to as prongs one, two, and three—for a university to comply" with the "interests and abilities" requirements of Title IX. *Id.* These prongs are as follows:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided *in numbers substantially proportionate to their respective enrollments*; or
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show *a history and continuing practice of program expansion* which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the *interests and abilities of the members of that sex have been fully and effectively accommodated* by the present program.

*Id.* (emphases added) (quoting OCR Policy Interpretation, 44 Fed. Reg. 71413, 71418). As Judge Underhill aptly summarized in *Biediger*:

> Prong one provides a "safe harbor" for universities. "[A] university . . . may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup." Prongs two and three allow a university lacking "substantially proportionate" athletic participation opportunities to remain in compliance by demonstrating "an ongoing effort to meet the needs of the underrepresented gender" or where the university can demonstrate it has fully and effectively accommodated the interests and abilities of the underrepresented sex.

*Id.* (internal citations omitted) (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 897–98 (1st Cir. 1993)). Title IX also prohibits retaliation against those who have raised concerns regarding Title IX compliance or gender discrimination. Indeed, the Supreme Court has recognized that retaliation is itself a form of gender discrimination within the meaning of Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005).

12

In the Second Circuit, Title IX claims are analyzed under the familiar three-step *McDonnell Douglas* burden-shifting framework. *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). The *McDonnell Douglas* test proceeds as follows: (1) plaintiff "bears the minimal burden of setting out a *prima facie* discrimination case," (2) if plaintiff satisfies its burden, plaintiff "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action," and (3) if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (internal quotation marks and citations omitted).

A plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by demonstrating: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action [by the defendant]; and (4) a causal connection between the protected activity and the adverse action. *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 495 (S.D.N.Y. 2023). At issue here is the fourth element of a retaliation claim—causation.

Absent direct evidence of a causal connection, a plaintiff may rely upon circumstantial evidence that gives rise to an inference of a retaliatory motive. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 2009). For example, temporal proximity between the protected activity and the adverse action can give rise to an inference of retaliatory motive for purposes of a plaintiff's initial burden. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Similarly, disparate treatment of a similarly situated person outside plaintiff's protected class can give rise to such an inference. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

The parties disagree as to Plaintiffs' burden with respect to causation. Defendants argue that Plaintiffs' burden is to establish that retaliation was a "but for" reason for the rugby team

13

demotion—that is, that it would not have occurred absent the desire to retaliate. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Plaintiffs argue that they need only establish that retaliation was a "motivating factor" for the decision, even if other, legitimate reasons are present. Upon review, the Court agrees with Defendants.

Discrimination and retaliation claims under Title IX have long been analyzed under the same framework as discrimination and retaliation claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In response to the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989),[10] in the Civil Rights Act of 1991 (the "1991 CRA"), Congress amended Title VII's statutory scheme to require "motivating factor" causation for *discrimination* claims. 42 U.S.C. § 2000e-2(m) ("Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). However, Congress did not amend the statute prohibiting *retaliation* under Title VII. The Second Circuit had long held that a plaintiff bringing a Title VII retaliation claim was required to prove only that retaliation was a motivating factor for the adverse action. *See, e.g.*, *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993); *Terry v. Ashcroft*, 336 F.3d 128, 140–41 (2d Cir. 2003). And in 2011, consistent with that long-standing practice, the Second Circuit held that a plaintiff bringing a *Title IX* retaliation claim was also only required to prove that retaliation was a motivating factor for the adverse action. *Papelino v. Albany Coll. of Pharm.*, 633 F.3d 81, 92 (2d Cir. 2011).

---

[10] For a summary of the Supreme Court's decision in *Price Waterhouse*, and how Congress responded to it in amending Title VII, see the Supreme Court's discussion in *Nassar*, 570 U.S. at 348–49. *See also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020).

In *Nassar*, the Supreme Court held that the 1991 CRA's amendment to Title VII's discrimination provision did not apply to Title VII retaliation claims which, it held, require the traditional standard of "but for" causation. 570 U.S. at 349. Since *Nassar*, courts have wrestled with the question of whether—and if so, how—*Nassar* impacts Title IX retaliation claims, given the long-standing practice of treating claims under Title VII and Title IX similarly. *See, e.g.*, *Doe v. Manor Coll.*, 587 F. Supp. 3d 249, 252–53 (E.D. Pa. 2022); *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 758–59 (M.D. Tenn. 2019) (collecting cases). Some courts have applied *Nassar*'s "but for" standard to Title IX, while others have confined *Nassar* to Title VII retaliation claims only and have applied the "motivating factor" test. *Compare Hunt v. Washoe Cnty. Sch. Dist.*, No. 3:18-CV-501 (LRH), 2019 WL 4262510, at *7 (D. Nev. Sept. 9, 2019) (extending *Nassar* to Title IX retaliation claims); *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 37–38 (D.D.C. 2018) (same); *Trudeau v. Univ. of N. Tex. ex rel. Bd. of Regents*, 861 F. App'x 604, 607–08 (5th Cir. 2021) (same); *Harriram v. City Univ. of N.Y.*, No. 22-CV-9712 (JAV), 2026 WL 801900, at *6 (S.D.N.Y. Mar. 23, 2026) (applying "but for" causation to Title IX retaliation claim without analysis); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (summary order) (applying "but-for" causation without discussion); *with Manor Coll.*, 587 F. Supp. 3d at 256 (declining to extend *Nassar* to Title IX retaliation claims and applying circuit precedent of motivating factor); *Brake v. Liberty Univ., Inc.*, No. 6:25-CV-17 (NKM), 2026 WL 581209, at *4 (W.D. Va. Mar. 2, 2026) (same), *reconsideration granted on other grounds by* 2026 WL 1103284 (Apr. 23, 2026); *St. Ange v. ASML, Inc.*, No. 3:10-CV-79 (WWE), 2015 WL 7069649, at *2–3 (D. Conn. Nov. 13, 2015) (declining to extend *Nassar* to § 1981 retaliation claims, using similar reasoning); *Bastidas v. Good Samaritan Hosp. LP*, No. 13-CV-4388 (SI), 2016 WL 6834139, at *5 & n.5 (N.D. Cal. Nov. 21, 2016) (same).

Since *Nassar*, the Second Circuit has not had occasion to address this question in a precedential decision. However, in *Baldwin v. N.Y. State*, 690 F. App'x 694 (2d Cir. 2017) (summary order), the Second Circuit observed in a Title IX retaliation case that "the desire to retaliate must be a 'but-for cause of the challenged employment action.'" 690 F. App'x at 697 (quoting *Burrage v. United States*, 571 U.S. 204, 212 (2014)). In addition, in *Radwan v. Manuel*, 55 F.4th 101 (2d Cir. 2022), the Circuit discussed at length recent Supreme Court jurisprudence, to include *Nassar*, regarding the extent to which Title IX remains tethered to Title VII. 55 F.4th at 130–32. At issue was the requisite burden of establishing causation for Title IX *discrimination* claims. The discussion, which was *dicta*, identified reason to question whether, in light of *Nassar* and other recent Supreme Court cases, the standard for Title IX discrimination claims is "but for" causation, notwithstanding the 1991 CRA's amendment to Title VII. *Id.* at 131–33. Ultimately, as the plaintiff conceded the "but for" standard in that case, the Circuit did not need to decide the question. *Radwan* suggests strongly that the burden of establishing Title IX *discrimination* claims is "but for" causation. *See id.* at 131. And because discrimination claims and retaliation claims under Title IX derive from a single statutory text—"on the basis of sex"—and because the Supreme Court has said that retaliation under Title IX is simply a form of sex discrimination, *see Jackson*, 544 U.S. at 178, it would be incongruous, to say the least, to conclude that Title IX discrimination claims require "but for" causation but that retaliation claims require only "motivating factor" causation. *See Manor Coll.*, 587 F. Supp. 3d at 253 ("The textual analysis of Title IX for both [discrimination and retaliation claims] centers on the same phrase, 'on the basis of' sex. . . . Thus, to read the same phrase in Title IX as establishing two different causation standards would counter

16

common sense, as well as the Supreme Court's construction of Title IX and the Supreme Court's reasoning in *Nassar*.").[11]

Thus, under the traditional standard of "but for" causation, a plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846; *Nassar*, 570 U.S. at 360. "However, 'but-for' causation does not require proof that retaliation was the *only* cause of the employer's action," as there may be multiple "but for" causes for an adverse action. *See Kwan*, 737 F.3d at 846 & n.5 (emphasis added); *see also Radwan*, 55 F.4th at 131 ("However, even under the more stringent 'but-for' standard, 'a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.'" (quoting *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020))).

To establish *prima facie* causation, Plaintiffs rely on Coach Carlson's consistent and longstanding practice of challenging Quinnipiac's disparate treatment of the women's rugby team as compared to various QU men's sports, as well as the two formal Title IX complaints she filed with the OCR. Coach Carlson raised these gender-based disparities as recently as the date of her 2025 performance evaluation which appears to have been signed on April 29, 2025. Pls.' Ex. 19. Although Defendants argue that Plaintiffs have failed to offer any basis upon which an inference of retaliatory motive might be inferred, Plaintiffs' burden at this stage is *de minimis*, *see Columbia Univ.*, 831 F.3d at 56, and the entirety of the record does raise the specter of retaliation.[12]  The

---

[11] Notably, the *Manor College* court concluded that the causation standard for Title IX retaliation claims was "motivating factor." However, that court did so in light of binding Third Circuit precedent that the causation burden for Title IX discrimination claims was "motivating factor." As discussed above, although the Second Circuit has not explicitly addressed this issue post-*Nassar*, the Court is mindful of both the *Baldwin* and *Radwan* decisions as informing this outcome.

[12] The Court agrees that the inference, at this stage, is not particularly compelling. If, as posited, Quinnipiac had a long-standing desire to be rid of Coach Carlson, it could have simply accepted her resignation in 2024 when it was tendered. The Court agrees with Defendants that the decision not to do so all but defeats the retaliation claim

Court therefore proceeds to steps two and three of *McDonnell Douglas*—Defendants' proffered reason for the adverse action and Plaintiffs' claim of pretext.

Defendants explained that the decision to demote the rugby team to club status accomplished several goals. It allowed Quinnipiac, with the addition of a men's track team, to establish substantial proportionality as required under Prong One of Title IX. Amodio testified that drawing from the men's cross-country team to fill the indoor/outdoor track roster would not require significant additional expense and would bring the men vs. women rosters into alignment under Prong One. This testimony was not disputed, and Plaintiffs concede that if the rosters are filled as anticipated, Quinnipiac will have achieved substantial proportionality as to participation opportunities for its undergraduate student body.

Amodio also testified that the bylaws for the Metro Atlantic Athletic Conference (MAAC), of which Quinnipiac is a member, require a minimum number of men's teams. Quinnipiac had been consistently one team short of meeting this requirement, and the addition of the new track programs for men allowed them to come into compliance with MAAC bylaws.

Amodio also testified that the Athletic Department could achieve the 6% budget reduction over time with the demotion of rugby. Rugby, although the only team targeted for a change of status, was the only remaining women's team still classified as an "emerging sport" by the NCAA.

---

premised on protected activity that pre-dated that decision. *See Gagliardi v. Sacred Heart Univ.*, No. 3:17-CV-857 (VAB), 2020 WL 264757, at *2 (D. Conn. Jan. 17, 2020) (noting that plaintiff "did not explain why, after many months of complaining of gender discrimination, followed by [Defendant]'s decision to re-hire him, [Defendant] would suddenly decide to fire him based on his gender discrimination complaints"), *aff'd*, 855 F. App'x 1 (2d Cir. 2021); *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (noting that because plaintiff had been complaining about the pay structure for years, she was required to explain why a more recent complaint would "suddenly trigger retaliation"). Plaintiffs' response to this argument is entirely speculative. They posit that perhaps Defendants were concerned about a constructive discharge lawsuit, given that Coach Carlson was so frustrated that she opted to resign. But there is no evidence of such a concern, and Amodio was not asked at the hearing about the reasons Fraser chose not to accept Coach Carlson's resignation. Notwithstanding, insofar as Coach Carlson continued to engage in protected activity after July 2024, the Court addresses Defendants' proffered reason for demoting the rugby team and Plaintiffs' claims of pretext.

18

Rugby had long been designated as an emerging sport, and there are still only thirteen Division 1 women's varsity rugby teams in the country. Amodio saw no sign that women's rugby would be elevated to championship sport status. By contrast, Amodio was aware that there is a heavily populated and very robust club community for women's rugby through National Collegiate Rugby.

The Court concludes that Defendants have articulated legitimate, non-retaliatory reasons for the demotion of the women's rugby team. In response, through a combination of speculation and perhaps a dose of cynicism deriving (rightly or wrongly) from the *Biediger* litigation and the prior Consent Decree, Plaintiffs assert that Defendants' proffered reasons are pretext for retaliation.

Under the third step of *McDonnell Douglas*, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846. Temporal proximity alone is insufficient to ultimately establish "but for" causation at the pretext stage of *McDonnell Douglas*. *See id.* at 847; *Neal v. Specialty Cable Corp.*, No. 3:21-CV-497 (SALM), 2022 WL 4584082, at *9 (D. Conn. Sept. 29, 2022) (Merriam, J.).

As to the issue of coming into compliance with Title IX, Plaintiffs opine that Defendants could have added more opportunities for men to account for the women rugby players. This appears to be accurate as a simple matter of math. But the Court has no evidence regarding what such an addition might look like or what it might cost. The evidence in the record supports the conclusion that adding an additional men's team, on top of the men's track team while *also* keeping the women's rugby team, could not be accomplished while reducing the Athletic Department budget by 6%. It would be speculative to conclude otherwise.

19

Plaintiffs also challenge whether Title IX compliance was a factor in QU's decision at all. Although the decision to realign the team rosters was made in early Spring 2026, the projected roster numbers for the 2026–2027 academic year (which would, if met, achieve substantial proportionality) were not circulated to the coaches of the teams until May 13, 2026. Plaintiffs argue that this delay demonstrates that meeting the roster projections (and therefore Title IX compliance) was not the priority that Defendants claim at the time the decision was made. This observation is not without some force. That said, the roster projections for 2026–2027 were either identical to the rosters from 2025–2026, or varied by only a few student athletes.[13] There is no evidentiary basis to conclude that these variations could not be achieved even with the arguably untimely disclosure, especially where the projections called for a reduction in the number of students rostered to a particular team. The exception to this, of course, is the men's indoor and outdoor track teams, as those programs were newly added for the 2026–2027 academic year. The Court cannot predict whether the men's indoor and outdoor track programs will have the number of student athletes projected,[14] or whether the timing of the disclosure will have any impact on the number of student athletes rostered. At the time of trial, whether Quinnipiac has succeeded in establishing substantial proportionality by adding these teams, following the arguably late disclosure, will undoubtedly be revealed. At present, in light of the substantial anticipated overlap between the men's existing cross-country team and the new indoor and outdoor track teams, and the assessment that the roster numbers will be achieved, the arguably late disclosure does not so

---

[13] Defendants' Exhibit 505 revealed that, of the 20 returning programs, 5 required no change to the number of rostered students; 9 required a reduction in rostered students; and only 7 required an increase in the number of students rostered—by 1, 2, or 3 students, depending upon the sport.

[14] Although, Amodio testified that QU anticipated that the vast majority of the male cross-country student athletes would also join the new men's indoor and outdoor track teams. He also testified that, even if a handful of men's cross-country runners choose not to join the track teams, QU is not concerned about meeting their 2026–2027 roster projections.

undermine the proffered reason of complying with Title IX as to suggest pretext, and thus, a retaliatory motive.

As to the Defendants' claimed budgetary concerns, Plaintiffs challenge the explanation that across-the-board cuts and the commensurate reduction in staffing and coaches would impact the teams' ability to remain competitive in recruiting and in competition. Plaintiffs point to the 2023 men's ice hockey national championship which followed budget cuts in 2019 and 2020. Thus, Plaintiffs posit, the hockey team was able to remain competitive after budget cuts, and Defendants' stated concern (and the reason they rejected the early financial model) is not true and is pretext for retaliation. Amodio clarified that the 2019 and 2020 budget reductions were to "operational" expenses only and did not involve, as was the case here, cuts to staffing. But in any event, the 2023 success of the men's hockey team does not undermine Quinnipiac's assessment that such aggressive across-the-board cuts to all team programs would wreak havoc on several of the various programs, to include their ability to recruit and remain competitive.

Plaintiffs next challenge the budgetary concerns as pretextual in light of Quinnipiac's decision to opt into the *House* Settlement, and the fact that, as a result, Quinnipiac is now making either revenue sharing or NIL payments to some of its student athletes. Plaintiffs posit that the need to compete in the post-*House* era is the real motivation for the demotion, which, in turn, supports an inference that the budgetary concerns are not true. Plaintiffs offer only speculation in this regard. While it is certainly possible, as posited by Professor Osborne, that *House* is going to have a significant, potentially fatal, impact on compliance with Title IX, the Court cannot rely on such potential financial pressures as a basis to undermine Defendants' proffered reasons. And in any event, the purported link between the decision to make NIL and revenue sharing payments to

21

student athletes and the purported retaliation against the rugby students for Coach Carlson's protected activity, is opaque, at best.

Plaintiffs next argue pretext because eliminating the rugby varsity program was the best way to be rid of Coach Carlson. By eliminating the program, they argue, Defendants avoid a Title IX retaliation claim by Coach Carlson if Defendants had simply fired her. This, too, is not supported by the record evidence. Indeed, there is no evidence that Coach Carlson had communicated any such intention to Defendants: she was not asked about any such intention or communication of such an intention to Defendants, nor was Amodio asked whether he had any discussions with anyone about such a possibility. Indeed, the record evidence is that Quinnipiac could have parted ways with Coach Carlson at the end of every year based upon Quinnipiac's practice of hiring coaches through one year appointment letters. And as discussed above, Quinnipiac's decision to challenge Coach Carlson's decision to resign and to not accept her tendered resignation letter in July 2024 substantially undermines any inference of a retaliatory motive for the demotion of the rugby program to club status.

Finally, Plaintiffs argue that Defendants never truly wanted women's rugby; that the team was never supported throughout the life of its existence; that it was added because of the *Biediger* litigation; that it was only the Consent Decree that precluded the team's earlier elimination; and that Defendants kept it because they had to, and as soon as the Consent Decree expired, they got rid of the team. This argument appears to go to the substantive discrimination claims as opposed to the retaliation claim. And the Court offers no opinion as to whether these accusations and allegations are true and only observes that, on the present record, unaided by discovery, the Court cannot conclude that Plaintiffs are likely to be able to prove these claims.

In sum, Plaintiffs have not offered sufficient evidence, at this juncture, to establish pretext, and accordingly, they have not, under the standards applicable to motions for preliminary injunctions, sufficiently established causation.  This is so under either the "but for" standard or the "motivating factor" standard for assessing the causal connection between the decision to demote the women's rugby team and Coach Carlson's protected activity.

## IV.    Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs have not met their burden of demonstrating *either* likely success on the merits of their claims *or* sufficiently serious questions going to the merits to make them a fair ground for litigation on the issue.  Plaintiffs' Motion for Preliminary Injunction (ECF No. 2) is DENIED.

The Court does not reach this conclusion lightly and recognizes the hardship visited upon the student athletes on the women's rugby team as a result of the decision to offer only club status women's rugby.  In an effort to mitigate that hardship, the Court intends to issue a condensed case management schedule with an aim of bringing this case to trial as quickly as possible.  If Plaintiffs prevail at trial and are awarded the injunctive relief they seek, at least with respect to the Title IX claims relating to the women's rugby program, the expectation is that there will be sufficient time, in advance of the 2027–2028 academic year, to reinstate the team as a varsity sport.  Further, for those Plaintiffs who remain at Quinnipiac, whether they have participated in club rugby or not, they will hopefully still have eligibility to compete at the varsity level should Plaintiffs ultimately prevail.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of June, 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE